## MASTRO PLASTICS CORP. ET AL. *v.* NATIONAL LABOR RELATIONS BOARD.

No. 19. Argued October 17, 1955.—Decided February 27, 1956.

*Bernard H. Fitzpatrick* argued the cause and filed a brief for petitioners.

*Dominick L. Manoli* argued the cause for respondent. With him on the brief were *Solicitor General Sobeloff, Theophil C. Kammholz* and *David P. Findling.*

MR. JUSTICE BURTON delivered the opinion of the Court.

This case presents two principal questions: (1) whether, in the collective-bargaining contract before us, the union's undertaking "to refrain from engaging in any strike or work stoppage during the term of this agreement" waives not only the employees' right to strike for economic benefits but also their right to strike solely against unfair labor practices of their employers, and (2) whether § 8 (d) of the National Labor Relations Act, as amended,[1] deprives individuals of their status as employees if, within the waiting period prescribed by § 8 (d)(4), they engage in a strike solely against unfair labor practices of their em-

---

[1] 61 Stat. 140, 142–143, 29 U. S. C. § 158 (d).

ployers. For the reasons hereafter stated, we answer each in the negative.

Mastro Plastics Corp. and French-American Reeds Manufacturing Co., Inc., petitioners herein, are New York corporations which, in 1949 and 1950, were engaged in interstate commerce, manufacturing, selling and distributing plastic articles, including reeds and other accessories for musical instruments. They operated in the City of New York within the same plant, under the same management and with the same employees. For collective bargaining, their employees were represented by Local 22045, American Federation of Labor, or by Local 3127, United Brotherhood of Carpenters and Joiners of America, AFL. These locals occupied the same office and used the services of the same representatives. During the period in question, the right of representation of petitioners' employees was transferred back and forth between them for reasons not material here. Accordingly, they are referred to in this opinion as the "Carpenters."

In August 1950, Local 65 of the Wholesale and Warehouse Workers Union began a campaign among petitioners' employees in an effort to become their collective-bargaining representative. Petitioners bitterly opposed the movement, believing Local 65 to be Communist-controlled. Feeling that the Carpenters were too weak to cope successfully with Local 65, petitioners asked the Carpenters to transfer their bargaining rights to Local 318, International Brotherhood of Pulp, Sulphite and Paper Mill Workers, AFL. When the Carpenters declined to do so, petitioners selected a committee of employees to visit 318, obtain membership cards and seek members for that union. The cards were distributed during working hours and petitioners paid their employees for time spent in the campaign, including attendance at a meeting of 318. Petitioners' officers and supervisors instructed

employees to sign these cards and indicated that those refusing to do so would be "out."

September 28, Local 65 filed with the National Labor Relations Board its petition for certification as bargaining representative. October 24, Local 318 intervened in the representation proceedings and asked that it be certified. However, many employees revoked their applications for membership in 318 and reaffirmed their adherence to the Carpenters. This was followed on October 31 by the Carpenters' refusal to consent to an election on the ground that petitioners had unlawfully assisted 318 in the campaign.[2]

November 10, 1950, a crisis developed when the president of petitioners summarily discharged Frank Ciccone, an employee of over four years' standing, because of the latter's activity in support of the Carpenters and his opposition to 318. We accept the finding of the National Labor Relations Board that petitioners "discriminatorily discharged, and thereafter refused to reinstate, Frank Ciccone because of his organizational activities in support of the . . . [Carpenters]."[3] This discharge at once precipitated the strike which is before us and which the Board found "was clearly caused and prolonged by the cumulative effects of the [petitioners'] unfair labor practices culminating in the discriminatory discharge of Ciccone."[4]

---

[2] In December, Locals 318 and 65 withdrew their representation proceedings from before the Board and the Carpenters (through Local 3127) filed its own representation proceeding. January 29, 1951, the Board issued a direction of election in the latter proceeding but, after the Carpenters filed charges of unfair practices, the Board postponed the holding of any election until the regional director might deem it proper.

[3] 103 N. L. R. B. 511, 512, and see 214 F. 2d 462, 464.

[4] 103 N. L. R. B., at 513. See also, the following findings of the trial examiner:

". . . the purpose of the strike was to protest and seek to remedy the [petitioners'] unfair labor practices. The record does not sup-

There was no disorder but the plant was virtually shut down until December 11 and it was March 9, 1951, before the Carpenters, on behalf of petitioners' employees, made an unconditional request to return to work. Petitioners ignored that request and neither Ciccone nor any of the other 76 striking employees has been reinstated.

While the strike against petitioners' unfair labor practices continued, the collective-bargaining contract between petitioners and the Carpenters approached its expiration date of November 30, 1950, and, apart from the above-described organizational controversy, the Carpenters had taken timely steps to secure modification of their agreement. October 10, they had delivered to petitioners a notice (dated September 29, 1950) "requesting modification" of the contract.[5] They thus had started the statutory negotiating period running as prescribed by

port a finding that the strike also had as an additional objective the termination or modification of the existing contract. It is true that demands for contract changes had previously been presented to the [petitioners], and there had been some discussion at meetings of Local 22045 or Local 3127 of a possible strike if such demands were not met. But no strike vote on that issue had ever been taken, nor was any strike action otherwise determined upon. On the record as a whole, I am fully satisfied, and I find, that the strike which immediately followed Ciccone's discharge was unplanned and began as a spontaneous demonstration by employees of their protest of the [petitioners'] unfair labor practices. Nor does the record reflect that its character changed after it began to one where the strikers were seeking to compel changes or modifications in economic terms or conditions of employment. There is no evidence that any negotiations were conducted or overtures made along such lines at any time after the commencement of the strike. The [petitioners] at the hearing made no such claim, and offered no evidence to establish that the strike had any purpose other than, or in addition to, that claimed by the General Counsel." 103 N. L. R. B., at 560. These were adopted by the Board, *id.*, at 511–512, and confirmed by the Court of Appeals, 214 F. 2d, at 465.

[5] 103 N. L. R. B., at 560 and 512, n. 2.

the above-mentioned § 8 (d).[6] The Carpenters met several times with petitioners and pressed their demands for changes in the contract but the expiration date passed without any agreement being reached.

---

[6] "SEC. 8. . . .

. . . . .

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That *where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—*

"(1) *serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof,* or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

"(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

"(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

"(4) *continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days* after such notice is given or until the expiration date of such contract, whichever occurs later:

"The duties imposed upon employers, employees, and labor organizations by paragraphs (2), (3), and (4) shall become inapplicable upon

In January 1951, the Carpenters initiated the present proceedings before the National Labor Relations Board by charging petitioners with unfair labor practices. Acting on those charges, the Board's general counsel filed a complaint alleging petitioners' support of Local 318 and discharge of numerous employees, including Ciccone, as violations of § 8 (a)(1), (2) and (3) of the Act.[7]

---

an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 9 (a), and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. *Any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee of the employer engaged in the particular labor dispute,* for the purposes of sections 8, 9, and 10 of this Act, as amended, but such loss of status for such employee shall terminate if and when he is reemployed by such employer." (Emphasis supplied except for the word *"Provided."*) 61 Stat. 140, 142–143, 29 U. S. C. § 158 (d).

[7] "SEC. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3).

"SEC. 8. (a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: . . .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: . . . ." 61 Stat. 140, 29 U. S. C. §§ 157, 158 (a)(1), (2) and (3).

Petitioners admitted that they had discharged the employees in question and had not rehired them. They denied, however, that in so doing they had committed any unfair labor practices. Their first affirmative defense was that the waiver of the right to strike, expressed by their employees in their collective-bargaining contract, applied to strikes not only for economic benefits but to any and all strikes by such employees, including strikes directed solely against unfair labor practices of the employer.

Petitioners' other principal defense was that the existing strike began during the statutory waiting period initiated by the employees' request for modification of the contract and that, by virtue of § 8 (d) of the Act,[8] the strikers had lost their status as employees. That defense turned upon petitioners' interpretation of § 8 (d), applying it not only to strikes for economic benefits but to any and all strikes occurring during the waiting period, including strikes solely against unfair labor practices of the employer.

The trial examiner made findings of fact sustaining the complaint and recommended that petitioners be ordered to cease and desist from the interference complained of and be required to offer to Ciccone and the 76 other discharged employees full reinstatement, together with back pay for Ciccone from November 10, 1950, and for the other employees from March 9, 1951. See 103 N. L. R. B. 511, 526–563. With minor modifications, the Board adopted the examiner's findings and conclusions and issued the recommended order. 103 N. L. R. B. 511. The chairman and one member dissented in part.

The Court of Appeals, with one judge dissenting in part, accepted the Board's findings of fact and conclusions of law and enforced the Board's order. 214 F. 2d 462. Since then, the Court of Appeals for the Seventh Circuit has reached a similar conclusion. *Labor Board* v. *Wagner*

---

[8] See note 6, *supra.*

*Iron Works,* 220 F. 2d 126. Because of the importance of the issues in industrial relations and in the interpretation of the National Labor Relations Act, as amended, we granted certiorari. 348 U. S. 910.

Apart from the issues raised by petitioners' affirmative defenses, the proceedings reflect a flagrant example of interference by the employers with the expressly protected right of their employees to select their own bargaining representative. The findings disclose vigorous efforts by the employers to influence and even to coerce their employees to abandon the Carpenters as their bargaining representatives and to substitute Local 318. Accordingly, unless petitioners sustain at least one of their affirmative defenses, they must suffer the consequences of their unfair labor practices violating § 8 (a) (1), (2) or (3) of the Act, as amended.

In the absence of some contractual or statutory provision to the contrary, petitioners' unfair labor practices provide adequate ground for the orderly strike that occurred here. Under those circumstances, the striking employees do not lose their status and are entitled to reinstatement with back pay, even if replacements for them have been made.[9] Failure of the Board to enjoin petitioners' illegal conduct or failure of the Board to sustain the right to strike against that conduct would seriously undermine the primary objectives of the Labor Act.

[9] Before the 1947 amendments to the National Labor Relations Act, see *Labor Board* v. *Poultrymen's Service Corp.,* 138 F. 2d 204, 210; *Labor Board* v. *Remington Rand, Inc.,* 130 F. 2d 919, 927–928; *Labor Board* v. *Moore-Lowry Flour Mills Co.,* 122 F. 2d 419, 426; *Ritzwoller Co.* v. *Labor Board,* 114 F. 2d 432, 437; *Labor Board* v. *Sunshine Mining Co.,* 110 F. 2d 780, 792; *Labor Board* v. *Boss Manufacturing Co.,* 107 F. 2d 574, 579; *Labor Board* v. *Carlisle Lumber Co.,* 99 F. 2d 533, 535; *Labor Board* v. *Remington Rand, Inc.,* 94 F. 2d 862, 871. Since the 1947 amendments, see *Labor Board* v. *West Coast Casket Co.,* 205 F. 2d 902, 907–908; *Labor Board* v. *Kobritz,* 193 F. 2d 8, 16–17.

See *Labor Board* v. *Rice Milling Co.,* 341 U. S. 665, 673. While we assume that the employees, by explicit contractual provision, could have waived their right to strike against such unfair labor practices and that Congress, by explicit statutory provision, could have deprived strikers, under the circumstances of this case, of their status as employees, the questions before us are whether or not such a waiver was made by the Carpenters in their 1949–1950 contract and whether or not such a deprivation of status was enacted by Congress in § 8 (d) of the Act, as amended in 1947.

I. *Does the collective-bargaining contract waive the employees' right to strike against the unfair labor practices committed by their employers?* The answer turns upon the proper interpretation of the particular contract before us. Like other contracts, it must be read as a whole and in the light of the law relating to it when made.

> ". . . we have two declared congressional policies which it is our responsibility to try to reconcile. The one seeks to preserve a competitive business economy; the other to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining. We must determine here how far Congress intended activities under one of these policies to neutralize the results envisioned by the other." *Allen Bradley Co.* v. *Local Union No. 3,* 325 U. S. 797, 806.

This contract was made in the light of that declared policy. A similar dual purpose is emphasized as follows in § 1 of the National Labor Relations Act, as amended:

> "It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they

have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 61 Stat. 137, 29 U. S. C. § 151. See also, the declaration of policy in § 1 (b) of the Labor Management Relations Act, 1947, 61 Stat. 136, 29 U. S. C. § 141 (b).

The two policies are complementary. They depend for their foundation upon assurance of "full freedom of association." *Only after that is assured* can the parties turn to effective negotiation as a means of maintaining "the normal flow of commerce and . . . the full production of articles and commodities . . . ." 61 Stat. 136, 29 U. S. C. § 141 (b).

On the premise of fair representation, collective-bargaining contracts frequently have included certain waivers of the employees' right to strike and of the employers' right to lockout to enforce their respective economic demands during the term of those contracts. *Provided the selection of the bargaining representative remains free,* such waivers contribute to the normal flow of commerce and to the maintenance of regular production schedules. Individuals violating such clauses appropriately lose their status as employees.[10]

---

[10] See *Dyson & Sons,* 72 N. L. R. B. 445, 457; *Scullin Steel Co.,* 65 N. L. R. B. 1294, enforced as modified, 161 F. 2d 143. While these cases were decided under the Act before its 1947 amendments, there is nothing in the amendments to suggest their subsequent inapplicability. Both are referred to with approval in the House Conference Report on the 1947 amendments. H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 39. See also, 93 Cong. Rec. 6442. But see *National Electric Products Corp.,* 80 N. L. R. B. 995, distinguished by the Board in the instant case, 103 N. L. R. B., at 514.

The waiver in the contract before us, upon which petitioners rely, is as follows:

"5. The Union agrees that during the term of this agreement, there shall be no interference of any kind with the operations of the Employers, or any interruptions or slackening of production of work by any of its members. The Union further agrees to refrain from engaging in any strike or work stoppage during the term of this agreement."

That clause expresses concern for the continued operation of the plant and has a natural application to strikes and work stoppages involving the subject matter of the contract.

Conceding that the words "in any strike or work stoppage during the [one-year] term of this agreement," if read in complete isolation, may include all strikes and work stoppages of every nature, yet the trial examiner, the Board and the Court of Appeals agree that those words do not have that scope when read in their context and in the light of the law under which the contract was made. This unanimity of interpretation is entitled to much weight.[11]

Petitioners argue that the words "any strike" leave no room for interpretation and necessarily include all strikes, even those against unlawful practices destructive of the foundation on which collective bargaining must rest. We disagree. We believe that the contract, taken as a whole, deals solely with the economic relationship between the employers and their employees.[12] It is a typical collec-

---

[11] While two members of the Board and one of the Court of Appeals disagreed with their respective majorities as to petitioners' defense based upon § 8 (d), no member of either body has expressed a dissent from the Board's interpretation of the contract.

[12] The preamble states that "the parties hereto desire to enter into an agreement relating to the rates of pay, hours of work and other conditions of employment which will provide methods of harmonious

tive-bargaining contract dealing with terms of employ-
ment and the normal operations of the plant. It is for
one year and assumes the existence of a lawfully desig-
nated bargaining representative. Its strike and lockout
clauses are natural adjuncts of an operating policy aimed
at avoiding interruptions of production prompted by
efforts to change existing economic relationships. The
main function of arbitration under the contract is to pro-
vide a mechanism for avoiding similar stoppages due to

co-operation between the Employers and their employees and to
that end accomplish fair and peaceful adjustments which may arise
without interruption of the Employers' businesses . . . ."

The balance of the contract relates to: (1) Limitation of employ-
ment to union members in good standing; definitions of exempt em-
ployees and union shop; (2) Availability of arbitration, under § 19,
in disputes as to failures to maintain union memberships; (3) Check-
off of union dues; (4) Exempt employees and new employees;
(5) Strike waiver as quoted in text; (6) Lockout waiver as follows:
"The Employers agree that there shall be no lockout during the
term of this agreement." (7) Arbitration, under § 19, to determine
whether a strike, work stoppage or lockout has actually occurred;
(8) Probationary periods for new employees; (9) Employers to
have control over plant production and business requirements result-
ing in layoffs, furloughs or intra-plant transfers; (10) Employee
seniority; (11) Hours of work; (12) Work weeks and extra shifts;
(13) Rest periods; (14) Overtime; (15) Holidays; (16) Rates of
pay and wage incentives; (17) Contract not to be interpreted so as
to reduce wages, standards or working conditions; (18) Union officers
who are active employees and union stewards governed by plant
rules; (19) (a) Disputes as to meaning and application of the con-
tract are subject to arbitration; (b) Rights of employees to present
grievances to their employers are assured; (20) Notice of work days;
(21) Vacations; (22) Employers' rights to manage plant and to dis-
charge employees "for proper cause" preserved; union to cooperate
with employers in interest of employee efficiency; (23) A specific
wage increase is prescribed in lieu of an increase recently awarded
by arbitration; (24) Effective December 1, 1949—November 30,
1950, with 60-day notice of intention to modify or terminate, and in
such event "negotiations shall be promptly started."

disputes over the meaning and application of the various contractual provisions.

To adopt petitioners' all-inclusive interpretation of the clause is quite a different matter. That interpretation would eliminate, for the whole year, the employees' right to strike, even if petitioners, by coercion, ousted the em- ployees' lawful bargaining representative and, by threats of discharge, caused the employees to sign membership cards in a new union. Whatever may be said of the legality of such a waiver when explicitly stated, there is no adequate basis for implying its existence without a more compelling expression of it than appears in § 5 of this contract.

There has been no court decision called to our attention which has held that the employees' right to strike against unfair labor practices has been waived by language such as that which is before us. On the other hand, prior to such contract, such language had been held by the Board to apply appropriately to economic strikes with consequent loss of employee status.[13]

It is suggested that § 13 of the Act, as amended, precludes reliance by the Board upon the Act for support of its interpretation of the strike-waiver clause. That section provides that "Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right." 61 Stat. 151, 29 U. S. C. § 163. On the basis of the above language, petitioners claim that because the contract-waiver clause prohibits all strikes of every nature, nothing in the Act may be construed to affect the "limitations or qualifications" which the contract thus places on that right. Such a claim assumes the point at issue. The Board relies upon the context of the

---

[13] See note 10, *supra*.

contract and upon the language of the clause itself, rather than upon the statute, to define the kind of strike that is waived.

As a matter of fact, the initial provision in § 13 that nothing in the Act "shall be construed so as either to interfere with or impede or diminish in any way the right to strike" adds emphasis to the Board's insistence upon preserving the employees' right to strike to protect their freedom of concerted action. Inasmuch as strikes against unfair labor practices are not anywhere specifically excepted from lawful strikes, § 13 adds emphasis to the congressional recognition of their propriety.[14]

For the reasons stated above and those given by the Board and the court below, we conclude that the contract did not waive the employees' right to strike solely against the unfair labor practices of their employers.

II. *Does § 8 (d) of the National Labor Relations Act, as amended, deprive individuals of their status as employees if, within the waiting period prescribed by § 8 (d)(4), they engage in a strike solely against unfair labor practices of their employers?* Here again the background is the dual purpose of the Act (1) to protect the right of employees to be free to take concerted action as provided in §§ 7 and 8 (a),[15] and (2) to substitute collective bargaining for economic warfare in securing satisfactory wages, hours of work and employment conditions. Section 8 (d) [16] seeks to bring about the termination and modification of collective-bargaining agreements without interrupting the flow of commerce or the production of goods, while §§ 7 and 8 (a) seek to insure freedom of concerted action by employees at all times.

---

[14] See *Labor Board* v. *Rice Milling Co.*, 341 U. S., at 673.

[15] See note 7, *supra*.

[16] See note 6, *supra*.

The language in § 8 (d) especially relied upon by petitioners is as follows: "Any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9, and 10 of this Act, as amended . . . ." 61 Stat. 143, 29 U. S. C. § 158 (d).

Petitioners contend that the above words must be so read that employees who engage in any strike, regardless of its purpose, within the 60-day waiting period, thereby lose their status as employees. That interpretation would deprive Ciccone and his fellow strikers of their rights to reinstatement and would require the reversal of the judgment of the Court of Appeals.[17] If the above words are read in complete isolation from their context in the Act, such an interpretation is possible. However, "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States* v. *Boisdoré's Heirs,* 8 How. 113, 122. See also, *Peck* v. *Jenness,* 7 How. 612, 622–623; *Duparquet Co.* v. *Evans,* 297 U. S. 216, and *United States* v. *American Trucking Assns.,* 310 U. S. 534, 542–543.

Reading the clause in conjunction with the rest of § 8, the Board points out that "the sixty-day period" referred to is the period mentioned in paragraph (4) of § 8 (d). That paragraph requires the party giving notice of a desire to *"terminate or modify"* such a contract, as part of its obligation to bargain under § 8 (a)(5) or § 8 (b)(3), to continue "in full force and effect, without resorting to

---

[17] Although the notice required to put the 60-day waiting period into operation in this case was not delivered until 51 days before the expiration of the contract, it was dated more than 60 days before such expiration date and it has been treated by all concerned as putting the waiting period into effect.

strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later." Section 8 (d) thus seeks, during this natural renegotiation period, to relieve the parties from the economic pressure of a strike or lockout in relation to the subjects of negotiation. The final clause of § 8 (d) also warns employees that, if they join a proscribed strike, they shall thereby lose their status as employees and, consequently, their right to reinstatement.

The Board reasons that the words which provide the key to a proper interpretation of § 8 (d) with respect to this problem are "termination or modification." Since the Board expressly found that the instant strike was *not to terminate or modify* the contract,[18] but was designed instead to protest the unfair labor practices of petitioners, the loss-of-status provision of § 8 (d) is not applicable. We sustain that interpretation. Petitioners' construction would produce incongruous results. It concedes that prior to the 60-day negotiating period, employees have a right to strike against unfair labor practices designed to oust the employees' bargaining representative, yet petitioners' interpretation of § 8 (d) means that if the employees give the 60-day notice of their desire to modify the contract, they are penalized for exercising that right to strike. This would deprive them of their most effective weapon at a time when their need for it is obvious. Although the employees' request to modify the contract would demonstrate their need for the services of their freely chosen representative, petitioners' interpretation would have the incongruous effect of cutting off the employees' freedom to strike against unfair labor practices aimed at that representative. This would relegate the employees to filing charges under a procedure too slow

---

[18] See note 4, *supra.*

to be effective. The result would unduly favor the employers and handicap the employees during negotiation periods contrary to the purpose of the Act. There also is inherent inequity in any interpretation that penalizes one party to a contract for conduct induced solely by the unlawful conduct of the other, thus giving advantage to the wrongdoer.[19]

Petitioners contend that, unless the loss-of-status clause is applicable to unfair labor practice strikes, as well as to economic strikes, it adds nothing to the existing law relating to loss of status. Assuming that to be so, the clause is justifiable as a clarification of the law and as a warning to employees against engaging in economic strikes during the statutory waiting period. Moreover, in the face of the affirmative emphasis that is placed by the Act upon freedom of concerted action and freedom of choice of representatives, any limitation on the employees' right to strike against violations of §§ 7 and 8 (a), protecting those freedoms, must be more explicit and clear than it is here in order to restrict them at the very time they may be most needed.

There is sufficient ambiguity here to permit consideration of relevant legislative history. While such history provides no conclusive answer, it is consistent with the view taken by the Board and by the Courts of Appeals for the Second and Seventh Circuits.[20]

Senator Ball, who was a manager for the 1947 amendments in the Senate and one of the conferees on the bill, stated that § 8 (d) made mandatory what was already

---

[19] See Note, 53 Col. L. Rev. 1023, 1025.

[20] With the exception of one suggestion in a minority report, which is discussed elsewhere, the relevant committee reports describe the provisions of § 8 (d) as being applicable to economic strikes and do not suggest their applicability to strikes against unfair labor practices in violation of §§ 7 and 8 (a). S. Rep. No. 105, 80th Cong., 1st Sess. 24; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 34–35.

good practice and was aimed at preventing such interruptions of production as the "quickie strikes" occasionally used to gain economic advantages.

"The provision in the National Labor Relations Act defining collective bargaining, and providing that where a contract between a union and an employer is in existence, fulfilling the obligation on both sides to protect [bargain] collectively means giving at least 60 days' notice of the termination of the contract, or of the desire for any change in it, is another provision aimed primarily at protecting the public, as well as the employee, who have been the victims of 'quickie' strikes. I do not think that is taking away any rights of labor . . . it is simply saying that they should all follow the sound, fair, and sane procedure which a majority of the good ones now follow." 93 Cong. Rec. 5014.

One minority report suggested a fear that § 8 (d) would be applicable to unfair practice strikes. The suggestion, however, was not even made the subject of comment by the majority reports or in the debates.[21] An unsuccessful minority cannot put words into the mouths of the majority and thus, indirectly, amend a bill.[22]

The record shows that the supporters of the bill were aware of the established practice which distinguished between the effect on employees of engaging in economic strikes and that of engaging in unfair practice strikes.[23]

---

[21] S. Rep. No. 105, Pt. 2, 80th Cong., 1st Sess. 21–22; 93 Cong. Rec. 6385, 4036, 6503.

[22] "The fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory words is in doubt." *Schwegmann Bros.* v. *Calvert Corp.*, 341 U. S. 384, 394–395, and see *S. H. Camp & Co.* v. *Labor Board*, 160 F. 2d 519, 521.

[23] " . . . to hold that a worker who because of an unfair labor practice has . . . gone on strike is no longer an employee, would be

If Congress had wanted to modify that practice, it could readily have done so by specific provision. Congress cannot fairly be held to have made such an intrusion on employees' rights, as petitioners claim, without some more explicit expression of its purpose to do so than appears here.[24]

Finally, petitioners seek support for their interpretation of § 8 (d) from the fact that its last clause makes a cross-reference to §§ 8, 9 and 10 of the Act. Such reference does not expand the scope of § 8 (d). It merely makes it clear that *if* § 8 (d) is violated by the employees to whom it applies, then they lose their status as employees for the purposes of §§ 8, 9 and 10.[25]

As neither the collective-bargaining contract nor § 8 (d) of the National Labor Relations Act, as amended, stands in the way, the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE MINTON and MR. JUSTICE HARLAN join, dissenting.

The petitioners are corporations in the plastics manufacturing business in New York and are subject to the Taft-Hartley Act, 61 Stat. 136, 29 U. S. C. § 141. In November 1949 they negotiated a one-year collective bargaining agreement with the Carpenters Union, A. F. L.,

---

to give legal sanction to an illegal act and to deny redress to the individual injured thereby." S. Rep. No. 573, 74th Cong., 1st Sess. 6–7.

[24] For example, Senator Ball proposed an amendment, to the definition of "employee" in § 2 (3) of the Act, which unintentionally might have abrogated the distinction which favored the employees' right to engage in unfair practice strikes as against economic strikes, but at once withdrew the amendment as going "too far," when this possible effect of it was brought to his attention. 93 Cong. Rec. 1827–1828.

[25] See H. R. Rep. No. 245, 80th Cong., 1st Sess. 27; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 38–39.

governing wages, hours and working conditions. The agreement provided for the arbitration of disputes and contained a clause outlawing strikes. During the life of this agreement, the Wholesale and Warehouse Workers Union commenced the solicitation of members among petitioners' employees, and in September 1950 requested the National Labor Relations Board to certify them as exclusive bargaining representative.

In an effort to keep the Warehouse Workers out of their plant, the petitioners enlisted the aid of a third union, the Pulp and Mill Workers. This latter organization had bested the Wholesale and Warehouse Workers elsewhere in organizational wars. Petitioners proselytized among their employees on behalf of the Pulp and Mill Workers, which in late October, having gained sufficient adherents, intervened in the representation proceeding initiated before the Board by the Warehouse Workers.

Meanwhile the Carpenters had written petitioners on October 10, stating that they wished to negotiate a new contract to take effect upon the expiration of the current agreement. The letter made specific demands, and bargaining over them followed. When the petitioners' organizational activities became manifest, the Carpenters lodged unfair-labor-practice charges with the Board. Some members of the incumbent union tried to counteract the influence of the petitioners upon the employees. Frank Ciccone, a machinist, was one who was active in urging employees to remain loyal to the Carpenters.

On November 10 Ciccone was discharged because of this. The discharge, in conjunction with the antecedent employer unfair labor practices, precipitated a plant-wide strike accompanied by peaceful picketing. The strike continued until early February when the participants requested reinstatement. The request was rejected by the petitioners which had earlier notified the strikers of their discharge.

The proceedings that followed before the Board resulted in findings against the employers of unfair labor practices under § 8 (a)(1), (2) and (3). The Board entered a cease and desist order, and affirmatively directed petitioners to reinstate the discharged strikers with back pay. 103 N. L. R. B. 511. Chairman Herzog and Member Murdock dissented from the latter portion of the Board's order. The Court of Appeals for the Second Circuit (Swan, J., dissenting in part) enforced the Board's order. 214 F. 2d 462. We granted certiorari because of the important question of the construction of the Taft-Hartley Act raised by the case. 348 U. S. 910.

Petitioners did not contend in the Court of Appeals, nor have they argued here, that the Board erred either in finding them guilty of committing unfair labor practices, or in concluding that the strike was precipitated by these illegal practices. Rather they maintain that the Board lacked the power to order the discharged strikers reinstated. Two reasons are urged. First, the strike is claimed to constitute a breach of the labor agreement between petitioners and the bargaining representative of the strikers, and was therefore unprotected activity. Such is not the case. The Board and the Court of Appeals rightly held that the "no-strike" clause in the contract does not cover a work stoppage provoked by the petitioners' unfair labor practices. The second reason is that the strikers ceased to be employees within the meaning of the Act, and therefore were not entitled to reinstatement. Petitioners contend that the discharged workers lost their status as employees by reason of the 60-day "cooling-off" period provided by § 8 (d) of the Act.

. Section 8 (d) defines the duty of the employer and the union to bargain collectively. A long proviso in the section treats specifically of the duty during the period

of contract renegotiation. The relevant portions of the section follow:

". . . where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

. . . . .

"(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later: . . . Any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9, and 10 of this Act, as amended, but such loss of status for such employee shall terminate if and when he is reemployed by such employer." 61 Stat. 142–143, 29 U. S. C. § 158 (d).

The discharged employees struck during the 60-day period, for the notification required by § 8 (d)(1) was given on October 10, and the strike began on November 10. The holding of the Board, however, sustained by the Court of Appeals, is that the loss-of-status provision does not apply to an unfair-labor-practice striker.

This provision was one of the amendments to the Wagner Act made by the Labor Management Relations Act, 61 Stat. 136. If the provision, couched in ordinary nontechnical language, is to be read as ordinary English words, concededly the striking employees lost their "status" as employees of petitioners "for the purposes of sections 8, 9, and 10 . . . ." Accordingly they were not entitled to re-employment by the petitioners, and the Board was without authority to order their reinstatement. The real problem, then, is to determine whether controlling considerations preclude giving the ordinary meaning to what Congress has written. While literalness of construction does not conclude ascertainment of a statute's meaning, it certainly is the beginning.

The so-called canons of construction are not technical rules of law which afford the answer to a problem like this. But they are "axiom[s] of experience" (*Boston Sand & Gravel Co.* v. *United States*, 278 U. S. 41, 48), helpful guides in determining when language as plain as ours should be respected and enforced. Relevant guides in construing an amendatory provision like the one in issue are: (1) what was the state of the law before the amendment and (2) what light is shed on the specific provision by placing it in the context of the legislation, *i. e.*, the Taft-Hartley Act, of which it is a part, in order to secure harmony and not discord of result. In a word, enactments like the Wagner Act and the Taft-Hartley Act must be considered as an organic whole.

Under the original Wagner Act, employees were given the right in § 7 "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection." Duties were imposed upon the employer under § 8. Among these, he could not interfere with the exercise by employees of their

rights under § 7, and he was required to bargain in good faith with the employees' representative. When the Board found that an employer had violated his duty under § 8, it was empowered under § 10 to order the employer to cease and desist from so doing and to take action undoing his violation, including the reinstatement of discharged employees, if such reinstatement would effectuate the policies of the Act.

While the employer had numerous obligations to his employees and their bargaining representative, the union and the employees were under no statutory duty to the employer. For example, the union was not required to bargain in good faith, and it was not forbidden to strike in order to achieve its demands during a period of contract renegotiation.

If this case had come up under the Wagner Act the results would be clear. The employers violated § 8 and thereby unleashed the strike. Such a strike would not have been in violation of any statutory duty because the union and the employees had no duties under the Wagner Act. Since the employers had committed an unfair labor practice, the Board had jurisdiction and could order the discharged strikers reinstated with back pay. *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177. Furthermore, the employers' discharge of their employees because they engaged in a strike was itself an unfair labor practice under § 8 for it interfered with their § 7 right to engage in "concerted activities."

The Wagner Act did not define "concerted activities." All collective action, however, was not concerted activity protected by § 7. We held in *Labor Board* v. *Fansteel Metallurgical Corp.*, 306 U. S. 240, that a sit-down strike was not § 7 activity; and in *Southern S. S. Co.* v. *Labor Board,* 316 U. S. 31, we decided that a strike in violation of the laws against mutiny was not protected under § 7. If an employer interferes with collective

employee action which is not sanctioned by § 7, he does not violate § 8, and in the absence of a violation of § 8 the Board cannot take action under § 10. Thus if an employer discharges workers because they engaged in a sit-down strike for higher wages, the Board cannot order him to reinstate the strikers. Since § 8, however, did not place any duties upon employees or unions, most peaceful collective action was protected under § 7, because most peaceful activity did not infringe some implicit federal labor policy or some other federal policy, such as that represented by the statute against mutiny.

The Taft-Hartley Act changed the situation. Section 8 of the Wagner Act was amended and duties were placed upon unions. Collective action which violates any of these duties is of course activity unprotected by § 7. See Cox, The Right to Engage in Concerted Activities, 26 Ind. L. J. 319, 325–333 (1951). One of these new union duties, and an important one, is contained in § 8 (d): unions may not strike to enforce their demands during the 60-day "cooling-off" period.

By reason of this new enactment, participating workers would not be engaged in a protected activity under § 7 by striking for the most legitimate economic reasons during the 60-day period. The strike would be in violation of the provision of that section which says that during the period there shall be no resort to a strike. The employer could discharge such strikers without violating § 8. This would be so if § 8 were without the loss-of-status provision. The Board would be powerless to order reinstatement under § 10. The loss-of-status provision in § 8 (d) does not curtail the Board's power, since it did not have power to order reinstatement where a strike is resorted to for economic reasons before the 60-day period has expired. In such a situation the striker has no rights under §§ 8 and 10. Yet the Board would have us construe the loss-of-status provision as applicable only

to the economic striker and qualifying a power which the Board does not have.

It is with respect to the unfair-labor-practice striker that the provision serves a purpose. This becomes clear if we assume that there were no such provision and examine the consequences of its absence. On such an assumption, a strike based on an unfair labor practice by the employer during the 60-day period may or may not be a protected activity under § 7. If it is, obviously discharged strikers would be entitled to reinstatement. The strike would not be a § 7 activity, however, if, for example, it were in breach of a no-strike clause in the contract which extends to a work stoppage provoked by an employer unfair labor practice, cf. *Labor Board* v. *Sands Mfg. Co.,* 306 U. S. 332, 344, or if the no-strike clause in § 8 (d)(4) (not to be confused with the loss-of-status provision) extends to such a work stoppage. However, even if the strike is not a § 7 activity, the Board in the unfair-labor-practice strike situation as distinguished from the economic strike situation, may in its discretion order the discharged participants reinstated. This is so because of the antecedent employer unfair practice which caused the strike, and which gave employees rights under § 8. If the Board finds that reinstatement of such strikers is a remedy that would effectuate the policies of the Act, it has the power under § 10 (c) to issue the necessary order.

This would not be the case, however, if the loss-of-status provision were held applicable to unfair-labor-practice strikes, because participating workers would lose their rights as "employees" for the purposes of §§ 8 and 10. Under the Act only "employees" are eligible for reinstatement. The unfair-labor-practice strike, then, is the one situation where loss of status for the purposes of §§ 8 and 10 is of significance. At any rate, we have not been advised of any other situation to which the provision would apply.

We are therefore confronted with the demonstrable fact that if the provision stripping strikers of their status as employees during the 60-day period is to have any usefulness at all and not be an idle collection of words, the fact that a strike during that period is induced by the employer's unfair labor practice is immaterial.* Even though this might on first impression seem an undesirable result, it is so only by rejecting the important considerations in promoting peaceful industrial relations which might well have determined the action of Congress. In the first place, the Congress may have set a very high value on peaceful adjustments, *i. e.,* the absence of strikes. One may take judicial notice of the fact that this consideration was at the very forefront of the thinking and feeling of the Eightieth Congress. And there is another consideration not unrelated to this. While in a particular case the cause of a strike may be clear, and in a particular case there may be no controversy regarding the

---

*It may be noted that the opponents of the Taft-Hartley Act objected to the loss-of-status provision for just this reason:

"[T]he section is silent as to the Board's authority to accommodate conflicting issues such as provocation on the part of the employer. Under this section an employer desirous of ridding himself either of the employees or their representative can engage in the most provocative conduct without fear of redress except by way of a lengthy hearing before the Board and a subsequent admonition to thereafter 'cease and desist' from such practices. In striking contrast to the relatively delicate treatment provided for such action by an employer, employees unwilling idly to countenance abuse, who resort to self-help under the circumstances are removed from the protection of the statute and lose 'employee' status. An employer is at liberty under such circumstances freely to replace any employee bold enough to insist upon justice. The provision denies to the Board the exercise of any discretion to accommodate the equitable doctrine of 'clean hands.' The provisions of the section are conclusive—the employee is subject to summary dismissal irrespective of the employer's conduct." S. Rep. No. 105 (Minority), Part 2, 80th Cong., 1st Sess. 21–22 (1947).

circumstances which prove that an employer committed an unfair labor practice, as a matter of experience that is not always true, indeed often it is not true. One of the sharpest controversies, one of the issues most difficult of determination, is the very question of what precipitated a work stoppage. This is especially true where a new contract is being negotiated. It is not at all unreasonable, therefore, to find a congressional desire to preclude litigation over what all too often is a contentious subject and to deter all strikes during the crucial period of negotiation.

We need not agree with a legislative judgment in order to obey a legislative command. It is enough for us that Congress did not legislate idly, but did intend the loss-of-status provision to have an effect. "We are not at liberty to construe any statute so as to deny effect to any part of its language. It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word. As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' This rule has been repeated innumerable times. Another rule equally recognized is that every part of a statute must be construed in connection with the whole, so as to make all the parts harmonize, if possible, and give meaning to each." *Market Co.* v. *Hoffman,* 101 U. S. 112, 115–116. Since the loss-of-status provision has an effect only in an unfair-labor-practice strike, the judgment of the Court of Appeals should be reversed.