**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NEW YORK TELEPHONE COMPANY, Respondent.**

**No. 1010, Docket 90-4136.**

United States Court of Appeals, Second Circuit.

Argued Jan. 31, 1991.

Decided April 16, 1991.

Paul Hitterman, Washington, D.C. (Howard E. Perlstein, Supervisory Atty., Jerry M. Hunter, Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C.), for petitioner.

Michael Hertzberg, New York City, for respondent.

Before KEARSE, PRATT and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

This is a petition by the National Labor Relations Board ("Board") for enforcement of its decision and order finding that respondent, New York Telephone Company ("Company"), committed unfair labor practices when it refused to furnish information about the processing of pending grievances to the designated bargaining representative, the Communications Workers of America ("Union"). Because we agree that the Union did not waive its right to gain access to employee personnel files relevant to pending grievances, we enforce the Board's order.

## BACKGROUND

Deborah Henderson and Phyllis Tracy were employed as "drafters" in the Company's office in Buffalo, New York. Allegedly because of a pattern of unsatisfactory performance reviews both employees were downgraded to "engineer study clerks." After complaints from Henderson and Tracy, the Union commenced a grievance proceeding against the Company. In order to fulfill its obligation to prosecute such grievances, the Union asked to see the personnel files of all other drafters employed by the Company to determine whether others had received similar unsatisfactory appraisals without suffering the same consequences. The Company refused to comply, claiming that the Union request was both unreasonable and irrelevant to the pending grievances, and that the employees whose files were to be turned over had not given their written consent to the Union's inspection of their files.

After discussion, the Union's executive vice president, Donald Loretto, struck a deal with the Company's director of labor relations, Henry Loskorn, for the Company to provide "sanitized" copies of the requested files. Under this agreement, the Company would provide the records of all those drafters who had received unsatisfactory appraisals, provided that it was first allowed to delete all identifying information from the files.

Upon receipt of only fourteen "sanitized" files, Loretto became suspicious that the Company was fudging because the Union's records indicated that more than fourteen grievances had been filed on behalf of individual drafters. Loretto contacted Loskorn about the discrepancy. Loskorn and William Donaldson—the Company employee who had gathered the requested files and passed them on to the Union—spoke to Loretto in an effort to assure him that the Company had supplied all the files called for by the agreement. Loskorn would later claim that Loretto seemed satisfied that the Company had supplied all the agreed upon data.

Far from satisfied, however, Loretto renewed his original request for the unexpurgated personnel files of all the Company's drafters. The Company once again refused, this time specifically citing to Article 35 of the collective bargaining agreement, which the Company interpreted as requiring employee authorization before disclosure of personnel records to the Union. Article 35 stated:

Once each year an employee may inspect the appraisals of his performance as an employee, or entries in his personnel record with respect to absence or tardiness. Also on reasonable notice and at reasonable intervals, a Local Union Officer or International Union Representative may inspect the items in an employee's record referred to above if such Local Union Officer or International Union Representative has the employee's written consent to do so.

When the Company continued to refuse to produce the requested personnel data, the Union filed unfair labor practice charges. The Administrative Law Judge ("ALJ") found that the Company's intransigence amounted to a refusal to bargain, in violation of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("Act"). 29 U.S.C. §§ 158(a)(1) & (5) (1988). The Company excepted to the ALJ's ruling and appealed to a three-member panel of the Board. The Board consolidated the complaint with a similar complaint in which the Union had filed an unfair labor practice charge because of the Company's refusal to provide the tardiness records of bargain-

ing-unit workers employed in the Company's garage, located in Tonawanda, New York. The parties had stipulated that the garage records were relevant to a pending union grievance, and as with the drafters' grievances, the Company had refused to release these tardiness records without authorization from the employees, again citing Article 35 of the collective bargaining agreement.

The Company asserted that Article 35 constituted a waiver by the Union of its right to gain access to personnel information relevant to the processing of employee grievances. The Union disagreed, arguing that Article 35 was intended to apply only to the pre-grievance stage, not to pending grievances. Finding that Article 35 did not amount to a waiver by the Union, the Board held that the Company had committed unfair labor practices by refusing to supply the requested information.

The Board now petitions for enforcement of its order.

## DISCUSSION

■ It is beyond cavil that because the bargaining-unit representative is obliged to prosecute the grievances of its members, an employer must provide all information relevant to the processing of those grievances. *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 435–36, 87 S.Ct. 565, 567–68, 17 L.Ed.2d 495 (1967). On this appeal, the Company does not claim otherwise; rather, it argues that the Union contractually waived its right to get access to certain personnel files. As has often been stated, national labor policy casts a wary eye on claims of waiver of statutorily protected rights. *E.g., Olivetti Office U.S.A., Inc. v. NLRB*, 926 F.2d 181, 187 (2d Cir.1991); *NLRB v. United Technologies Corp.*, 884 F.2d 1569, 1575 (2d Cir.1989); *Chesapeake & Potomac Telephone Co. v. NLRB*, 687 F.2d 633, 636 (2d Cir.1982). The employer bears the weighty burden of establishing that a "clear and unmistakable" waiver has occurred. *See Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983); *Olivetti*, 926 F.2d at 187; *United Technologies Corp.*,

884 F.2d at 1575. Given the Board's expertise in labor matters, its decision on the question of waiver is accorded significant deference and will not be overturned if supported by substantial evidence. *Olivetti*, 926 F.2d at 187; *United Technologies Corp.*, 884 F.2d at 1575.

■ A clear and unmistakable waiver may be found in the express language of the collective bargaining agreement; or it may even be implied from the structure of the agreement and the parties' course of conduct. *See Metropolitan Edison Co.*, 460 U.S. at 708–09, & n. 12, 103 S.Ct. at 1477–78 & n. 12; *see also Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 279–84, 76 S.Ct. 349, 356–59, 100 L.Ed. 309 (1956) (contractual provision must be read in context to determine whether a waiver was intended). Evidence of an implied waiver based on the parties' past course of conduct may be found in their "past practices and bargaining history." *United Technologies Corp.*, 884 F.2d at 1575. No waiver will be implied, however, unless it is clear that the parties were aware of their rights and made the conscious choice, for whatever reason, to waive them. We will not thrust a waiver upon an unwitting party.

■ The Company argues that, far from needing to search for evidence of an implied waiver, the language of Article 35 amounts to an express, even blatant waiver of the Union's right to the personnel records of employees. The Company, therefore, believes that the Board should have looked no further than the plain language of the contract in making its decision. We disagree. Even where the contract language appears to be unambiguous—an assertion with which we do not agree—the Board is authorized to examine pertinent extrinsic evidence in coming to its conclusion on the question of waiver. *See id.* at 1576. The extrinsic evidence relied on by the Board in this instance, the parties' bargaining history and past practices, was clearly relevant to the issue of waiver, and the Board was correct to weigh it in the calculus.

■ At first reading, the Company's argument—i.e., that access to employee personnel files was conditioned, at all times, on obtaining written consent from the employee—seems compelling. However, the argument is severely undercut when Article 35 is read in the context of the entire contract, as is required. *See Mastro Plastics,* 350 U.S. at 279–84, 76 S.Ct. at 356–59. Nothing in the language of Article 35 refers specifically to the grievance process. The procedure for filing and prosecuting grievances is set out in detail in Article 11 of the collective bargaining agreement, and Article 11 makes no mention of the proposed limitation on the Union's right to information relevant to grievances. We are left to speculate why not; and speculation cannot serve to support a clear and unmistakable waiver.

The Company's interpretation of Article 35 would require us to find that by creating *a* procedure for access to the relevant personnel data, the parties necessarily intended to make it *the* exclusive procedure, thereby closing off all other avenues for attaining such information. When Article 35 is read against the backdrop of Article 11, we are not satisfied that the parties clearly intended to restrict access to this information; it is just as likely that the parties intended to increase the availability of these records. With so basic a right as access to personnel records for the purpose of processing employee grievances hanging in the balance, an ambiguous expression of intent cannot suffice to carry the employer's weighty burden.

Evaluation of the past practices and bargaining history of the parties dispels any lingering doubt as to whether a waiver was intended. In discussing the parties' bargaining history, the Board stated:

[T]he Union originally proposed [A]rticle 35 in 1968, in order to guarantee employees the right to inspect their records, and to permit the Union to do so on the employees' behalf with their consent. The record further discloses that the Union proposed [A]rticle 35 in part to meet the [Company]'s complaint that the Union filed too many grievances; this provision permitted the Union to inspect an employee's records to determine, *in advance* of filing, whether a potential grievance had merit.

Far from supporting a claim of waiver, this bargaining history confirms the Board's conclusion that Article 35 was intended to grant the Union limited access to personnel files in the pre-grievance stage, i.e., when the Union was investigating a complaint in order to decide whether a formal grievance should be filed. The Company agreed to provide employees or the Union access to personnel data without first having to demonstrate relevance to a particular grievance. In return for compromising, the Company was given hope that fewer grievances would be filed, as the employees would no longer have to file baseless grievances just to examine their personnel records. Prior to Article 35, it was apparently the Company's practice not to disclose these files absent a pending grievance, but once a grievance was filed, the Company did not insist on the written consent of the employees before releasing their personnel records. This bargaining history is supported by substantial evidence in the record.

Not surprisingly, the Company has its own version of the bargaining history. It calls our attention to Union Proposal # 6, which it claims was a bargaining proposal submitted by the Union in the 1968 negotiations. Union Proposal # 6 stated in pertinent part:

Upon the development of a grievance condition where necessary to develop pertinent facts having to do with the presentation or resolving of such a grievance, the personnel record of any employee shall be subject to inspection by the International and Local Unions upon such employee's written consent.

The Company asserts that this language indicates an intent on the part of the Union that Article 35 was to apply to pending grievances as well as those in the investigatory stage, making employee consent necessary at all times.

Little stock can be put in this proposal for several reasons. First, the language of this proposal is not as clear as the Compa-

ny would have us believe. In fact, this language comports just as fully with the Union's claim that it intended to expand its right of access during the pre-grievance stage. Second, in his testimony before the Board, Donald Sanchez, the Union's chief negotiator in 1968, was unable to determine with any certainty whether this proposal actually came from the Union's negotiating team. Sanchez testified that he did not remember this exact proposal. Sanchez added that if any proposal had been made to limit the Union's access to personnel data, there would have been much discussion among the Union's negotiators, and he would have been privy to such discussions. Sanchez could not recall any such talk. Finally, even if the language of this proposal were as unambiguous as the Company claims, at best it would be thin support for a claim of an unintentional waiver. As previously stated, we will not countenance such waivers. *See United Technologies Corp.*, 884 F.2d at 1575 ("[b]argaining history and past practices—if taken alone— may establish waiver of a mandatory bargaining subject when the matter was thoroughly aired in past negotiations and the union 'consciously yielded' its rights in the matter") (quoting *American Distributing Co. v. NLRB*, 715 F.2d 446, 450 (9th Cir. 1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984)). Union Proposal # 6 does not even approach the threshold of the Company's heavy burden.

## CONCLUSION

Nothing in the record indicates that Article 35 was intended as a waiver of the Union's right to obtain personnel data relevant to pending grievances. Rather, the record confirms the Board's view that Article 35 was intended to increase Union access to these files when no actual grievance was pending. The Company has failed, therefore, to establish a clear and unmistakable waiver. Because we find that the Board's decision is supported by substantial evidence, we enforce its order.

Enforcement granted.