WOODSTOCK INDUSTRIES CORPORA-
TION, d/b/a Woodstock Die Cast, Inc.,
a Delaware corporation, Plaintiff and
Counterdefendant,

v.

LOCAL UNION NO. 922 OF the UNITED
AUTOMOBILE, AEROSPACE AND AG-
RICULTURAL WORKERS OF AMER-
ICA, and the International Union, Unit-
ed Automobile Aerospace and Agri-
cultural Implement Workers of Amer-
ica, Defendants and Counterplaintiffs.

No. 87–C–20540.

United States District Court,
N.D. Illinois, W.D.

Oct. 11, 1988.

William I. Caldwell, Jr., Caldwell, Berner
& Caldwell, Woodstock, Ill., R. Ian Hunter,
Hunter, Luke & Martin, Brimingham,
Mich., for plaintiff and counterdefendant.

Irving M. Friedman, Jerome Schur, Mi-
chael B. Erp, Katz, Friedman, Schur &
Eagle, Chicago, Ill., for defendants and
counterplaintiffs.

## ORDER

ROSZKOWSKI, District Judge.

This case comes before the court on the
parties' cross-motions for summary judg-

ment. For the reasons set forth below, the court continues both motions for summary judgment as to Count I and the counterclaim and grants the defendants-counterplaintiffs' motion for summary judgment as to Count II of the complaint.

## BACKGROUND

The plaintiff-counterdefendant, Woodstock Industries Corp., Inc. d/b/a Woodstock Die Cast ("Woodstock" or "Company") under the auspices of the "Labor Management Relations Act of 1947", 29 U.S.C. § 185 ("LMRA"), sued the defendants-counterplaintiffs, Local Union 922 of the United Automobile, Aerospace and Agricultural Implement Workers of America ("Local 922" or "Union") and the International Union United Autoworkers, Aerospace, and Agricultural Implement Workers of America ("UAW" or "Union"), to enforce an arbitration award and to compel the Union to arbitrate the Company's grievance of July 31, 1987.

The defendants counterclaimed pursuant to the LMRA averring, among other things, that the Arbitrator's award was not final and hence not enforceable.

The present controversy stems either directly or indirectly from the parties' conflicting interpretations of the 1985 collective bargaining agreement between the Company and the Union. In Count I, the language in question provides as follows:

> All standards will be reviewed and established by July 1, 1986 in a manner determined by the company and the union with provisions for settlement of any disagreement.

Article X, Section 4 (1985 Collective Bargaining Agreement).

The Union interprets this passage to mean essentially that the manner for establishing standards must be mutually agreed upon by the Union and the Company. The Company, on the other hand, views the provision as similar to any other part of the contract; any disagreements over Section 4 could be resolved through the "Grievance Procedure" set out in the collective bargaining agreement.

Subsequent to the signing of the agreement, the parties participated in lengthy but fruitless negotiations to set the manner for establishing standards. The parties' interpretation of Article X, Section 4 inevitably came into conflict when the Company implemented the Maynard Operational Sequence Technique ("MOST") system of work measurement; while the Company maintained that the MOST system was used only for cost estimates, the Union filed a series of grievances against the Company basically charging that they violated the collective bargaining agreement by attempting to implement the manner of establishing standards without the Union's requisite agreement.

The Company maintained that such mutual agreement was not mandatory and that the Union was not entitled to what was, in effect, veto power over the manner of establishing work standards.

The parties submitted their disagreement to arbitration. The Arbitrator, Robert McAllister, rendered a decision and an award. In his decision, Arbitrator McAllister found that the manner of establishing standards was arbitrable. In addition, the Arbitrator, after specifying various remaining issues, assigned these issues to a Time Study Arbitrator for resolution. The plaintiff-counterdefendant now seeks in Count I the enforcement of the Arbitrator's award. The defendants-counterplaintiffs in their counterclaim, seek to vacate the award of Arbitrator McAllister based, *inter alia*, on a lack of finality.

With regard to Count II, the disputed language of the collective bargaining agreement can be found in Article V pertaining to "Grievance Procedures." The plaintiff interprets the language of Article V to allow the Company to file grievances against the Union. The Union contends that Article V does not authorize the Company to initiate a grievance against the Union.

This difference of opinion was demonstrated in July, 1987 when the Company filed a grievance concerning an alleged Union-sanctioned slowdown in Woodstock's polish and buff department. The Company

wanted to arbitrate the grievance; the Union argued that the Company was not authorized by Article V of the collective bargaining agreement to file a grievance. In Count II, the plaintiff seeks to compel the Union to arbitrate the July, 1987 grievance.

## DISCUSSION

■ Presently, both parties have moved the court to grant them summary judgment as to the original complaint and counterclaim. Each claims that the issues are ripe for decision, as there is no remaining genuine issue of material fact, and that they are entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c).

### Count I

The parties' respective positions with regard to Count I are clear. The Company asserts that the Arbitrator's award is proper in all respects and should be enforced. The defendants argue that the award violates 9 U.S.C. § 10(d) and the collective bargaining agreement because it lacks finality. In addition, the award is defective because the successor arbitrator is created *ex contractu* and empowered to decide the dispute without guidelines. Finally, the award further breaches the collective bargaining award by ignoring the express terms of the collective bargaining agreement by not assigning a Time Study Engineer to study the problem.

After examining the pleadings, briefs and other materials submitted, the court finds that the issues as framed by the parties speak more to the issue of the arbitrator's authority than to the finality of his award. Much of what the defendants find wrong with the arbitrator's award calls into question the arbitrator's authority.

It is well settled that an "arbitrator can bind parties only on issues that they have agreed to submit to arbitration, and whether an arbitrator has exceeded those bounds is an issue that courts properly may decide." [1] *International Ass'n of Machinists v. Texas Steel*, 639 F.2d 279, 283 (5th Cir.1981); *see also District 28, United Mine Workers v. Lowlands Coal*, 640 F.Supp. 1300, 1304–05 (W.D.Va.1986).

Picking up on this theme, the defendants, in effect, argue that the Arbitrator went beyond his authority by assigning issues to a Time Study Arbitrator without any guidelines and without first allowing a Time Study Engineer to study the problem. Similarly, the defendants' complain that the collective bargaining agreement does not allow for an initial arbitrator to assign remaining issues to a succesor arbitrator. Implicitly, the defendants refer to the lack of responsiveness of the Arbitrator to the issues in front of him. In sum, these complaints, among others, indicate a more immediate and fundamental disagreement over the Arbitrator's role and belie a more fundamental dispute over the issues before, and the authority of, the Arbitrator. Thus, the court finds a resolution as to the Arbitrator's authority may more directly address the varied contentions of the parties. For example, the defendants' complaints are only aimed at that portion of the Arbitrator's award regarding the successor arbitrator and specific aspects of the MOST system. If the court finds that the Arbitrator only had the issue of whether the manner of establishing standards was arbitrable before him, then after the Arbitrator decided that issue, any further decision or award would be *ultra vires* and unenforceable, and the instant controversy would be resolved.

If it is found, however, that the Arbitrator did indeed have authority to render his award as presently fashioned, then the issue of finality, as well as the other issues

---

1. As a preliminary matter, it is important to note a distinction between a decisionmaker first determining whether he or she has jurisdiction to decide a dispute before considering the substance of the dispute and merely deciding the substantive issue before him or her. The arbitrator, in the instant case, was not asked to decide whether he had jurisdiction to decide the issue or issues before him, because the two parties had already stipulated to allow Arbitrator McAllister to decide the issue or issues before him. Hence, there is no remaining question as to Arbitrator McCallister's ability to decide the issues submitted to him, only a question as to what exactly were (was) the issue (issues) before tbe Arbitrator.

previously mentioned, will necessarily be fully explored.

In the instant case, there is no dispute that the parties agreed to submit certain issue(s) to Arbitrator McAllister. The court, however, is aware of no formal document evidencing the submission agreement. Thus, the court must depend on other materials. Unfortunately, formal pleadings are not often used in arbitration proceedings and the issue(s) before an arbitrator must often be pieced together through other means such as informal writings, exchanges and discussions that have occurred throughout the prior steps of the grievance procedure. *Lowlands Coal*, 640 F.Supp. at 1304.

At this stage in the proceeding, the court has received many materials that are instructive as to the Arbitrator's authority. However, the court hesitates to decide the issue without allowing the parties to supplement existing materials. For example, briefs submitted to the Arbitrator, the transcript of the hearing before the Arbitrator, and even the original grievances filed by the Union, may all be helpful to decide what issue or issues were submitted to the Arbitrator.

Thus, the court continues the motion for summary judgment as to Count I and the counterclaim and grants leave to the parties to submit relevant materials on the issue of the Arbitrator's authority. Included among these materials should be Local Rule 12(e) and 12(f) statements. No briefs are necessary.

*Count II*

■ As mentioned above, each party seeks summary judgment as to Count II of the complaint. Count II basically provides that the Union has violated the parties' collective bargaining agreement by failing to comply with the agreement's "Grievance Procedure[s]." In particular, the plaintiff charges that the defendants' refusal to arbitrate the Company's July 31, 1987 grievance is a violation of Article V of the

bargaining agreement. In turn, the defendant maintains that Article V does not authorize the plaintiff to utilize the "Grievance Procedure[s]." The court is now faced with the responsibility of construing the collective bargaining agreement, and Article V in particular, to determine which interpretation is correct.

After examining Article V and employing basic tenets of labor contract construction, the court finds that the Company is not authorized to use the "Grievance Procedure" set out in Article V.

■ When construing a labor contract, the court must not unduly isolate one provision or one clause but must look at the contract as a whole. *Mastro Plastics Corp. v. N.L.R.B.*, 350 U.S. 270, 279, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956). When considering the whole document it is important to remember that the purpose of construing a contract is to give effect to the mutual intent of the parties at the time the contract is made. *Loveless v. Eastern Airlines*, 681 F.2d 1272, 1279 (11th Cir.1982). In most cases, the best evidence of this intent is the language of the contract. However, other relevant considerations for deducing intent include the bargaining history of the parties, the context in which the contract was negotiated, the interpretation of the contract by the parties and the past conduct of the parties. *International Broth. of Elec. Workers v. N.L.R.B.*, 788 F.2d 1412, 1414 (9th Cir.1986).

■ Indeed, a court may properly disregard the language of the contract when it is convinced the parties intended something different from what they said. *See White v. Roughton*, 689 F.2d 118, 120 (7th Cir.1982).[2] Even language which is otherwise explicit may be read with a modification needed to make it consistent with such a purpose. *White*, 689 F.2d at 120.

In the instant case, the language in the collective bargaining agreement sparking

---

**2.** *White v. Roughton, supra,* involves a non-labor agreement and while the court realizes that all the rules of contract construction do not automatically apply to a labor contract, the court

perceives no rationale for believing that the relevant reasoning of the *White* court would differ under tbe instant case's circumstances.

the present controversy provides as follows:

3. Before a grievance is submitted to arbitration, the Company or the Union, whichever presented the grievance, will be allowed up to a maximim [sic] of thirty (30) days in which to decide whether to submit the matter to arbitration or drop the matter and consider it cancelled. If the Union decides to arbitrate the grievance, it will within the above 30–day period notify the International Union of its intention. A copy of this letter will be sent to the Company. The party initiating the grievance will request a panel of seven (7) arbitrators from the Federal Mediation and Conciliation Service within ten days of receipt of the intent to arbitrate from the Union. By alternate striking of names from the panel, the lone remaining arbitrator shall be deemed selected. A selection of arbitrators shall take place within 10 days from receipt of the panel. If the grievance is not withdrawn within sixty (60) days after the mailing date of the Union's notice to the International, the grievance must be arbitrated at the earliest possible date.

The plaintiff points to the first sentence "... the Company or the Union, whichever presented the grievance, ...," as proof that the Company can utilize the grievance procedure. It would appear that language contemplates that either the Company or the Union can "present a grievance" for purposes of Article V. Such an interpretation, however, is entirely inconsistent with the other provisions of the "Grievance Procedure."

Simply put, the grievance procedure is custom-made for use by the Union. Ostensibly, Article V only provides the Company with the roles of addressing the Union's grievances in the initial three step grievance process and to contest the Union's grievance in the arbitration process.

Section 1 of the Article V "Grievance Procedure" provides in pertinent part:

When an employee or a group of employees or the Union has a grievance against the Company, it shall be processed in accordance with the Grievance Procedure hereinafter provided.

Section 2 contains a series of steps in which the employee or representative airs their grievance with a management official. In step 1, an employee or a steward meets with a foreman. In step 2, a steward meets with a management representative and a shop committeeman. In step 3, if the grievance remains unsolved, a written grievance is processed by the Plant Manager.

In Section 3, a final appeal is made to the Company, and the Company renders a Final Response to the grievance. If the Company's Final Response does not settle the grievance, it may be referred to the Arbitrator.

In arbitration, the language seems to suggest that either party, depending on who filed the grievance, has 30 days from the Final Response to submit the grievance to Arbitration. The Section then simply explains the process the Union must comply with in referring a grievance to arbitration.

The preceding review of Article V demonstrates the paradox of the plaintiff's position. The Company wishes to initiate and arbitrate a grievance pursuant to Article V but the procedures in Article V are all couched in the unilateral terms of processing the Union's grievance through preliminary meetings and arbitration.

Specifically, a faithful rendering of the Company's request would require the absurd circumstances of the Company meeting with representatives of itself, as set out in Step one through three, to resolve the Company's grievance. Furthermore, the Company would be required to make a Final Response to its own Final Appeal.

Furthermore, Paragraph 3 of Section 3 requires the company or Union, "whichever presented the grievance," to decide whether to submit the matter to arbitration or drop the matter and consider it cancelled. The paragraph, however, then provides the process in which the Union, and the Union only, can refer a grievance to arbitration. Even if it is assumed the Company can initiate a grievance, there is no process in

Article V providing the Company a way to refer a grievance to arbitration. Who does the Company contact—itself? There is no mention in Section 3 of Article V. Moreover, how can the Company, as the bargaining agreement requires, select a panel of Arbitrators within ten days of the Union's intent to arbitrate when the Company wants to arbitrate, not the Union.

A review of other collective bargaining agreements between the parties and other entities is also instructive as to the parties' intent. In a collective bargaining agreement between Woodstock and the International Brotherhood of Firemen and Oilers, AFL–CIO Local 111 ("Oilers Union"). After outlining the grievance procedure, the agreement explicitly allows Woodstock to initiate a grievance utilizing the grievance process in the agreement. As opposed to the one clause in the instant agreement, Article V of the Oilers Union agreement leaves no doubt that Woodstock may file a grievance. Article V provides in part:

> Should the Company or the Union have a grievance, either may present it in writing at Step 4 to the Committee as a whole, with recourse to Step 5 and 6 if not settled.

Defendant's Exhibit D; Article V.

Interestingly, the first three steps of the grievance procedure are reserved for the Union's grievances only, since these steps only relate to circumstances surrounding an employee or Union grievance and would be of no use to the Company in the event it had a grievance. This distinction illustrates the difficulty of interpreting the instant agreement to allow the Company to proceed through procedures clearly fashioned to handle only an employee's grievance.

In an agreement between Eltra's Canadian Battery Division and the Prestolite Unit Local 252 of the UAW, once again the ability of the Company to utilize the grievance procedure is explicitly stated in a separate paragraph as opposed to a single oblique clause in the entire Article. Section 6 of the Agreement provides in relevant part:

> Any alleged violation of the contract the Management wishes to bring to the attention of the Union may be submitted by the Manager or a representative delegated by the Manager, direct to Committee ... If for any reason any such matter is not settled within three (3) regular working days to the mutual satisfaction of the conferring parties, it shall then be considered as a grievance and submitted to arbitration as herein provided for any employee grievance.

*See* Defendant's Exhibit E; Section 6.

In addition, the Manager of Employee Relations for Woodstock, Pauline Grey, was unaware of Woodstock ever filing a grievance before the July 31, 1987 grievance. Defendant's Exhibit R–1; Pauline Grey's Deposition, p. 17.

Finally, a review of a prior national collective bargaining agreement between the Union and Eltra, a former owner of the Woodstock plant, may shed some light on where the disputed language in paragraph 3 emanated. In Section 1(c)(i) of the aforementioned agreement, a verbatim copy of the disputed language in Paragraph 3, Section 3 of Article V of the instant contract appears. The language in the national agreement was necessary for some of the plants who had collective bargaining agreements that allowed the management to file a grievance. It does not require much imagination to conclude that the disputed language in the instant contract was indiscriminately lifted from the Eltra–UAW agreement or one similar.

These past dealings buttress the argument that the disputed clause is an aberration and that there is no logical interpretation of the clause that allows the Company to utilize the Article V grievance procedure.

In sum, if the court assigned the meaning suggested by the Company, to the phrase "... the Company or the Union, whichever presented the grievance ..." the court would, in effect, be allowing the Company to use the Article V grievance procedure and concomitantly, allow the company to breach Article V because the Company could not possibly follow accurately the

procedures outlined in the Article V. Surely, the parties did not intend such a result when drafting Article V. It is abundantly clear that but for the words "... the Company or the Union, whichever presented the grievance, ..." Article V was intended to delineate the procedure for processing the Union's grievance from start to finish. Any interpretation allowing the Company to utilize Article V procedures is untenable, since as mentioned above, the procedures are specifically tailored for the Union, not the Company. The Court can only surmise that the words ... "the Company or the Union, whichever presented the grievance" is surplusage. As pointed out in *White v. Roughton, supra:*

> The people who draft contracts and consent decrees are fallible like the rest of us and often fail to express their agreement with precision. They take a terrible risk when they do this, but if a court can figure out what they meant but failed to say, it has the power and the duty to give effect not to the words but to the intentions behind them—always supposing that these are the joint intentions of the parties at the time the contract was made or the decree formulated and not just the secret intent of the parties. There is "uselage surplusage" in contracts as in statutes, (citations omitted), and in neither context should a court give effect to it.

*White,* 689 F.2d at 120.

Paragraph 3 of Section 3 of Article V essentially describes the length of time a grievant has to refer a grievance to arbitration. The paragraph also describes how the Union refers the grievance to arbitration. Upon a reading of the whole contract, the court determines that the intention of the parties was to describe the length of time the Union has to refer a grievance to arbitration. To interpret the language in any other way would create an absurdity. Thus, the plain languages of "the Company or the Union, whichever presented the grievance" must defer, as a matter of law, to the even plainer intent of the parties to authorize only the Union to utilize the Article V "Grievance procedure."

Finally, the plaintiff argues that even if the plaintiff is unauthorized to file a grievance, the defendant's objections are only procedural and therefore the province of the Arbitrator and not the court. The court finds that the plaintiff's argument is misplaced. The court maintains that the question of whether the plaintiff may initiate and arbitrate a grievance pursuant to Article V of the bargaining agreement questions the arbitrator's ability to hear the grievance. It must first be determined that the parties are obligated to submit to arbitration, before procedural matters which grow out of the dispute are addressed by an arbitrator. The scope of the Arbitrator's inquiry is reserved for the court's determination. *See John Wiley & Sons v. Livingston,* 376 U.S. 543, 557–58, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964).

In the instant case, if the Company cannot file a grievance, the Arbitrator has no authority to arbitrate it. Accordingly, for all the reasons set forth above, the Company is not entitled to file a grievance or refer a grievance to an arbitrator. The court grants summary judgment as to Count II in favor of the defendants-counterplaintiffs.

## CONCLUSION

The court continues the motions for summary judgment as to Count I and the counterclaim and allows the parties ten days leave to submit relevant materials on the issue of the arbitrator's authority. As to Count II, the court grants summary judgment in favor of the defendants-counterplaintiffs.