NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WASHINGTON HEIGHTS–WEST HAR-
LEM–INWOOD MENTAL HEALTH
COUNCIL, INC., d/b/a The Council's
Center for Problems of Living, Respon-
dent,

Local 1199, Hospital & Health Care
Employees Union, RWDSU,
AFL–CIO, Intervenor.

No. 485, Docket 89–4079.

United States Court of Appeals,
Second Circuit.

Argued Nov. 20, 1989.

Decided March 6, 1990.

Karen L. Arndt, Atty., NLRB, Linda Dreeben, Supervisory Atty., Joseph E. Desio, Acting General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, NLRB, for petitioner.

Richard J. Reibstein, Epstein Becker & Green, P.C., New York City (Michael A. Kalish, of counsel), for respondent.

Vicki Erenstein, Sipser, Weinstock, Harper & Dorn, New York City, for intervenor.

Before OAKES, Chief Judge, CARDAMONE, Circuit Judge, and POLLACK, District Judge.*

OAKES, Chief Judge:

This case is before us under 29 U.S.C. § 160(e) (1982) on a petition for enforcement by the National Labor Relations Board (the "Board") of an order dated July 26, 1988, against Washington Heights–West Harlem–Inwood Mental Health Council, Inc., d/b/a The Council's Center for Problems of Living (the "Center"). The Board's order, reported at 289 N.L.R.B. No. 145, seeks remedial measures against the Center for its discharge of thirty-four striking employees in April 1983. The central issue presented by the Board's petition is whether the Center's employees violated the ten-day advance notice requirement of section 8(g) of the National Labor Relations Act, *see* 29 U.S.C. § 158(g) (1982), before going on strike. We find that the employees did violate the notice requirement, and accordingly deny the Board's petition for enforcement of its order.

The Center is a non-profit corporation providing medical and professional care services for the mentally disabled. The registered nurses and professional and technical employees of the Center are organized into a union, Local 1199, Hospital & Health Care Employees Union, AFL–CIO (the "Union"), which has been their recognized collective bargaining representative since 1974 and has intervened in support of the Board's petition.

The last collective bargaining agreement between the parties was effective from January 1, 1979, through December 31, 1980. From January 1, 1981, to September 1982, the parties had no written agreement and operated under an oral agreement on

* Of the United States District Court for the Southern District of New York, sitting by designation.

wages. Negotiations for a new agreement were scheduled to begin on September 16, 1982.

To plan for upcoming negotiations, on September 15, Union Vice President David White met with a group of employees at 2:00 p.m. in a meeting room at the Center. Several employees rearranged their lunch hours and break periods to attend the meeting. The Center frequently permitted the Union to meet with employees on its premises, although these meetings were generally held at noon or after 5:00 p.m.

Apparently because the meeting was being held during regular working hours, the Center's executive director, Dr. Clyde Pemberton, interrupted the meeting, ordered White to leave, and instructed the employees to return to work. White responded that it was a regular Union meeting and that he would not leave until it was finished. Pemberton left, then returned, announced he had a "job action" on his hands, and left the room again.

At the end of the meeting, several employees discovered that their timecards had been pulled. White and thirty to forty employees went to the second floor to speak with Pemberton. Pemberton agreed to meet with White only, but White declined on the basis that it was against Union policy for a Union official to meet with management unaccompanied by an employee. The employees and White remained outside Pemberton's office chanting in unison to have their timecards returned and to see Pemberton. In the meantime, because of the state of disorder, the Center locked its doors to the public. At about 4:45 p.m., the police arrived and dispersed the crowd of employees.

The following morning of September 16, the day set for contract negotiations, approximately twenty-six employees were issued disciplinary letters accusing them of an illegal work stoppage during the previous afternoon and informing them that their pay would be docked for the time between 2:00 p.m. and the close of their regular duty. At the afternoon's scheduled bargaining session, Pemberton refused to discuss with White the events of that day and of the previous afternoon. The parties then discussed the Union's proposals for a new contract, but no agreement was reached on any issue.

At the close of the meeting, Pemberton was informed that the Union had sent the Center a telegram serving ten-day notice of the Union's intent to strike on September 28 at 9:00 a.m. Written notice specifying the date and time of a strike is required by section 8(g) of the National Labor Relations Act (the "Act") not less than ten days prior to commencing a strike at a health care institution.[1]

The telegram arrived the next day, September 17. At 5:00 p.m., thirteen employees discovered their timecards missing and were issued termination letters. The employees refused to accept them, because they were not accompanied by final paychecks. The letters were rescinded, but then reissued for eleven employees the following Monday, September 20. The stated basis for the termination letters was that the employees had engaged in another work stoppage by their delay in returning to work on September 16 after receiving their disciplinary letters.

On this same day, September 20, the employees confirmed by vote their decision to strike on September 28 because of the discharge of the eleven employees. The following day, however, they decided to move the strike to one day later in order that they might receive their pay checks on payday, September 29, prior to walking out. The Union gave no written notice of this change to the Center.

On September 22, the Union and the Center met again for further contract negotiations. Notwithstanding White's apology

---

1. Section 8(g) of the Act, 29 U.S.C. § 158(g), provides:

A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention.... The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of both parties.

for holding the September 15 meeting, Pemberton refused White's request to reinstate the eleven discharged employees. Amidst conflicting testimony, the administrative law judge in this case found that White also told Pemberton that the employees planned to strike on September 29, one day later than the initial date specified in their notice, through his alleged statement that "if we have not settled the issues that exist between us by the 29th, when the 29th comes we're going to find ourselves on the street."

One week later, on September 29, the Union went on strike. Shortly before the strike, Pemberton refused to meet with an official from the Federal Mediation and Conciliation Service. The strike continued over the next several months. On April 15, 1983, the Center discharged thirty-four employees because of their participation in the strike. The strike finally ended in August 1983.

Three separate sets of charges under 29 U.S.C. § 160(b) (1982) affecting this litigation were filed with the Regional Office of the Board, two by the Union and one by the Center. The Union filed the first charge on September 24, 1982, alleging in part that the Center's discharge of the eleven employees on September 20 violated sections 8(a)(1) and 8(a)(3) of the Act. *See* 29 U.S.C. §§ 158(a)(1), 158(a)(3) (1982).[2] The Regional Director issued a complaint on January 14, 1983, and approved an agreement between the parties settling the complaint on June 1, 1983.

On January 19, 1983, the Center filed the second charge, alleging that the Union violated section 8(b)(3) of the Act, *see* 29 U.S.C. § 158(b)(3) (1982), by refusing to bargain in good faith. The Center amended its charge in various ways on February 10, 1983, and then again on March 10, 1983, most significantly to allege the Union's violation of the section 8(g) ten-day notice requirement. Then, on April 21, 1983, the Union filed the third charge alleging the Center violated sections 8(a)(1) and 8(a)(3) by discharging thirty-four employees en-

gaged in an "unfair-labor-practice strike," one designed to protest the Center's allegedly unfair labor practice of discharging the eleven employees in September 1982.

On January 23, 1984, the Regional Director issued complaints based on the second and third charges by the Center and the Union, respectively. The theory of the first complaint was that the Union commenced its strike and picketing without giving the Center proper notice. The principal theory of the second complaint was that the thirty-four discharged employees were entitled to strike in response to the Center's earlier discharge of the eleven employees, notwithstanding the ten-day notice requirement, because it was either excused, by virtue of the Center's unfair labor practice, or satisfied, by virtue of White's statement to Pemberton at the September 22 meeting.

In view of the extent to which the complaints overlapped in issues of fact and law, the Regional Director consolidated the complaints for a joint hearing, even though they advanced mutually inconsistent legal theories whether the Union gave proper notice of the strike. Because of this inconsistency in legal theories, the General Counsel appointed two attorneys to present a prima facie case for each complaint. The parties were advised in the order consolidating the complaint that "in view of the unique nature of this proceeding the role of the Counsel for the General Counsel may be limited in regard to rebutting evidence proffered by a Respondent. The Charging Parties, therefore, may wish to have counsel or other representatives present to insure a complete record." In a subsequent letter dated April 9, 1984, the Regional Director informed the Center's attorney that the General Counsel's appointed attorneys would impeach witnesses only to the extent that it would not conflict with the alternative theory as to notice of the other complaint. This left the burden upon counsel for both parties to adduce evidence and develop further their own cases beyond that done by the General Counsel.

---

**2.** A similar charge was also filed four days later by one Christopher Sowley and was later con-

solidated into the same complaint with the Union's charge.

On December 31, 1985, the administrative law judge decided both complaints in the Union's favor. As a preliminary matter, the judge found that the Center had not been denied due process by the Regional Director's and the General Counsel's handling of the complaints and by the unusual manner in which the case was presented at the hearing. The judge found, moreover, that the settlement agreement of June 1, 1983, did not prohibit her from inquiring whether the Center's discharge of the eleven employees was an unfair labor practice. Such an inquiry, of course, was necessary for the judge to determine, first, whether the employees were engaged in an "unfair-labor-practice strike" and thus protected from discharge, and, second, whether the Union might be excused from the ten-day notice requirement under the exception carved out for unfair-labor-practice strikes in Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956) (unfair-labor-practice strike did not cause employees to lose protected status for violations of sixty-day waiting period under section 8(d), 29 U.S.C. § 158(d)). Taking up this very question, the judge found that the disciplinary letters of September 16, 1982, and the discharge of the eleven employees on September 20, 1982, were in fact unfair labor practices, resulting from discrimination on the basis of Union activities and not due to any illegal work stoppages. The judge further found that the main reason the employees went on strike was to protest the discharge of the eleven employees, and thus that the strike was excused from the ten-day notice requirement pursuant to the Mastro Plastics exception. Alternatively, the judge noted, the notice requirement was excused by Pemberton's refusal to meet with mediators during the ten-day notice period. The administrative law judge then concluded that even if the notice requirement were not excused, the requirement was satisfied, because White's statement to Pemberton at the September 22 meeting gave sufficient notice of the September 29 strike date. Therefore, on the basis that the notice requirement had not been violated and that the Union was other-wise privileged to strike, the judge concluded that the Center illegally discharged thirty-four striking employees on April 15, 1983.

On July 26, 1988, the Board adopted the judge's conclusions, but it relied only on the Mastro Plastics exception to excuse the notice requirement, and declined to endorse either of the judge's findings that Pemberton's failure to engage in mediation excused the notice requirement or that the Union satisfied the notice requirement. In addition, in response to the Center's exceptions to the administrative law judge's decision, the Board found that the six-month statute of limitations in section 10(b) of the Act, see 29 U.S.C. § 160(b) (1982), did not bar a finding that the Center committed an unfair labor practice by its discharge of the eleven employees.

The Board dismissed the complaint based on the Center's charge and, acting on the other complaint, entered an order requiring the Center, first, to cease and desist from discharging or discriminating on the basis of Union activities and, second, to offer each of the thirty-four discharged employees back pay with interest and immediate reinstatement to their former jobs or substantially equivalent jobs without any prejudice to seniority or other rights and privileges.

On this appeal, the Center raises three reasons for denying enforcement of the Board's order: (1) that it was denied due process of law by the Regional Director's and General Counsel's handling of the case; (2) that any finding of an unfair labor practice by the discharge of the eleven employees was barred by either the settlement agreement or the six-month statute of limitations; and (3) that the ten-day notice requirement was neither excused nor satisfied. We find no violation of due process and find that neither the settlement agreement nor the statute of limitations bars a determination that the discharge of the eleven employees was an unfair labor practice. We conclude, however, that the notice requirement was violated, because it was not excused or satisfied, and therefore

deny the Board's petition for enforcement of its order.

## DISCUSSION

### 1. *Whether the Center Was Denied Due Process*

■ The Center unleashes a menagerie of due process objections to the manner in which the complaints were issued, the order consolidating the two complaints, and the conduct of the investigation and the hearing before the administrative law judge. The Center stresses that the overall handling and hearing of this case was highly unusual, even unprecedented. We must note, however, that unless the Center shows some violation of established law or procedures, *see International House v. NLRB*, 676 F.2d 906, 912 (2d Cir.1982), or that it was specifically prejudiced, *see Ka Fung Chan v. INS*, 634 F.2d 248, 258 (5th Cir. Jan. 1981), an element of confusion or novelty alone does not violate due process. We now take up each objection in turn and consider whether the Regional Director or General Counsel impermissibly departed from established procedures or caused prejudice to the Center.

■ The Center directs us to no authority for the proposition that the Regional Director lacked the power to issue two complaints advancing inconsistent legal theories. On the contrary, the Regional Director has broad discretion under section 10(b) of the Act to issue a complaint. *See NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 126, 108 S.Ct. 413, 422, 98 L.Ed.2d 429 (1987) (noting "General Counsel's unreviewable discretion to file and withdraw a complaint"); 29 C.F.R. §§ 102.15, 102.19 (1989) (authorizing Regional Director to issue complaints subject to oversight by General Counsel). Moreover, we do not see any resulting prejudice to the Center.

■ Similarly, the Regional Director had broad discretion to consolidate the two complaints for a joint hearing to avoid unnecessary costs and delay. *See* 29 C.F.R. § 102.33(a)(2) & (c) (1989); *NLRB v. S.E. Nichols, Inc.*, 862 F.2d 952, 963 (2d Cir.

1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3162, 104 L.Ed.2d 1025 (1989). In addition, although the consolidation of the proceedings caused some confusion, no specific prejudice to the Center resulted. *See NLRB v. American Laundry Mach. Co.*, 152 F.2d 400, 401 (2d Cir.1945). Both the Union and the Center shared equal opportunities through cross-examination and presentation of rebuttal evidence to develop the cases presented by the attorneys appointed by the General Counsel. Given that both complaints involved essentially identical factual and legal issues, had the Director chosen to proceed with only one of the complaints, while holding the other in abeyance, the party whose charge was not prosecuted would have been put initially in a defensive posture, limited in its presentation of issues, and might well have been put at an unfair disadvantage. The Regional Director was well within his authority in consolidating the proceedings.

■ The General Counsel's appointment of two attorneys to present each complaint did not result in any prejudicial conflict of interest. The parties had ample notice that conflicts of interest would be avoided. In the order consolidating the complaint and a letter dated April 9, 1984, from the Regional Director to the Center's attorney, it was made plain that the government-appointed attorneys would avoid conflict to the extent possible, such as by refusing to rebut certain evidence or to impeach witnesses along lines that would call into question the theory of the opposing complaint. The April 9 letter also made clear to both parties that any information shared with the General Counsel would not necessarily be kept confidential. No prejudice resulted to the Center from this lack of confidentiality.

■ At the hearing stage, due process requires no more than a "fair hearing." *See Barrus Constr. Co. v. NLRB*, 483 F.2d 191, 194 (4th Cir.1973). The procedures of a hearing are fair and satisfy due process if, in general, each party has sufficient opportunity to prepare its case, *see NLRB v. Coca Cola Bottling Co.*, 811 F.2d 82, 87 (2d Cir.1987), and the opportunity to call and cross-examine witnesses and to present

pertinent evidence in support of its case. *See Barrus,* 483 F.2d at 194; *see also International House,* 676 F.2d at 911; Friendly, *Some Kind of Hearing,* 123 U.Pa.L.Rev. 1267, 1277–95 (1975). The failure of the General Counsel's appointed counsel for the Center's case to object to or to rebut certain evidence, or to impeach certain witnesses, did not violate due process, because the Center was given advance notice and a full opportunity to participate.

■ Nothing in the Act or the Board's rules and regulations provide that the General Counsel shall bear exclusive prosecutorial responsibilities at a hearing. To the contrary, any party may appear at a hearing to introduce evidence and to call, examine, and cross-examine witnesses. *See* 29 C.F.R. § 102.38 (1989). In a real sense, the Center's objection—that it was given too much responsibility to present its own case—is that it was afforded too much, not too little, due process.

■ Finally, the Center contends that it should have been permitted access to the General Counsel's investigative file. Pretrial discovery in Board proceedings is neither constitutionally nor statutorily required. *See NLRB v. Lizdale Knitting Mills, Inc.,* 523 F.2d 978, 980 (2d Cir.1975) (per curiam). Moreover, the General Counsel is not obligated to allow discovery of its own investigative files, because to do so might compromise its enforcement actions and allow intimidation of potential witnesses whose statements are in the file. *See NLRB v. Brookwood Furniture, Div. of U.S. Indus.,* 701 F.2d 452, 469 (5th Cir. 1983); *cf. NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 236–43, 98 S.Ct. 2311, 2323–27, 57 L.Ed.2d 159 (1978) (Freedom of Information Act does not compel pre-hearing disclosure of potential witness statements from NLRB files). Because the General Counsel sealed its investigative file not just to the Center but also to the Union, no prejudice resulted. In addition, because the Center's management was intimately involved in the events at issue, the Center had no special need for the investigative files. It had ample opportunity without the assistance of the investigative file to develop and present its case.

### 2. *Whether Inquiry into the Center's Discharge of the Eleven Employees Is Barred*

The next issue before us is whether either the settlement agreement or the six-month statute of limitations prevents inquiry into whether the Center's discharge of the eleven employees in September 1982 was an unfair labor practice. As noted earlier, such a finding is a necessary predicate to determining that the strike was protected activity for which the striking employees could not be discharged, *see Mastro Plastics,* 350 U.S. at 278, 76 S.Ct. at 355; *NLRB v. Lyon & Ryan Ford, Inc.,* 647 F.2d 745, 754 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981), and that the notice requirement might be excused pursuant to the *Mastro Plastics* exception.

■ The Center contends that the settlement agreement of June 1, 1983, prohibits a finding that its discharge of the eleven employees was an unfair labor practice. However, the reservation-of-rights clause in the settlement agreement provides:

> [T]his Agreement shall not preclude the introduction by any party of any evidence contained in [this case] in any forum, in any other proceeding or investigation.... The instant Settlement Agreement settles only the unfair labor practice charges in [this case] and does not settle any other cases currently pending before the Regional Office ... nor does it constitute a waiver of any claims that any party may have.

This clause was no accident. At the time that the settlement agreement was negotiated and approved, charges were pending in the case now before us. The agreement is thus self-evident that it only relieved the Center from further direct liability for the discharge of the eleven employees.

■ The Center also argues that the six-month statute of limitations of section 10(b) of the Act bars inquiry into the eleven discharges of September 1982, because

they occurred more than six months before the Union filed its charge on April 21, 1983. This invites us to consider, under the analysis laid out by the Supreme Court in *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 416–17, 80 S.Ct. 822, 826–27, 4 L.Ed.2d 832 (1960), and recently discussed by this court in *Haerum v. Air Line Pilots Ass'n*, 892 F.2d 216, 219 (2d Cir.1989), whether the limitations bars the inquiry, because the discharge of the eleven employees is necessarily relied upon to establish the alleged later unfair labor practice of the Center's discharge of the thirty-four striking employees, or whether the limitations does not bar the inquiry, because the discharge of the eleven employees only "sheds light" on the later independent unfair labor practice. We decline the invitation to take up this knotty issue. Nowhere among the Center's fourteen affirmative defenses set forth in its answer or amended answer to the complaint before the administrative law judge was the limitations defense raised. The administrative law judge did not consider it. Because the Center failed to raise the defense until filing its exceptions to the decision of the administrative law judge, the defense was waived. *See NLRB v. Vitronic Div. of Penn Corp.*, 630 F.2d 561, 563 (8th Cir.1979).

3. *Whether the Union Violated the Ten-Day Notice Requirement*

■ We finally arrive at the central issue presented in this appeal: whether the Union either satisfied or was excused from the ten-day advance notice requirement under section 8(g) before striking. This issue is critical, because the employees were privileged to strike only if the notice requirement was either satisfied or excused. Health care employees organized into a

union who strike without proper notice under section 8(g) commit an unfair labor practice, are unprotected by the Act, and subject to lawful discharge. *See Betances Health Unit, Inc.*, 283 N.L.R.B. 369, 370 (1987); *International Union of Operating Eng'rs, Local 948*, 238 N.L.R.B. 1113, 1117 & n. 7 (1978), *enforced sub nom., Osteopathic Hosp. Founders Ass'n v. NLRB*, 618 F.2d 633 (10th Cir.1980). Accordingly, if we find that the notice requirement was violated, we must deny the Board's petition for enforcement of its order.

■ We first consider whether the notice requirement was satisfied. The administrative law judge found that White's alleged statement at the September 22 meeting put the Center on notice that the strike date had changed to September 29. This is not enough. Whether White's statement is considered to be a new notice or an extension of the first notice, section 8(g) makes clear that notice, or any extension of notice, must be in written form. Therefore, the notice requirement was not satisfied.

■ The administrative law judge relied upon legislative history indicating that a strike or picketing need not occur at the precise time specified in the notice and that it would be reasonable to allow the strike or picketing to begin up to seventy-two hours past the time specified in the notice, so long as at least twelve-hour notice was given of the actual time for the commencement of the action. *See* S.Rep. No. 766, 93rd Cong., 2d Sess. 4 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 3946, 3949; H.R.Rep. No. 1051, 93rd Cong., 2d Sess. 5 (1974).[3] We need not, however, decide what weight, if any, to give to the legislative history, because the Union did

---

3. The Senate report states:

The 10–day notice is intended to give health care institutions sufficient advance notice of a strike or picketing to permit them to make arrangements for the continuity of patient care. It is not the intention of the Committee that a labor organization shall be required to commence a strike or picketing at the precise time specified in the notice; on the other hand, it would be inconsistent with the Committee's intent if a labor organization failed to act within a reasonable time after the time

specified in the notice. Thus, it would be unreasonable, in the Committee's judgment, if a strike or picketing commenced more than 72 hours after the time specified in the notice. In addition, since the purpose of the notice is to give a health care institution advance notice of the actual commencement of a strike or picketing, if a labor organization does not strike at the time specified in the notice, at least 12 hours notice should be given of the actual time for commencement of the action.

not provide twelve-hour supplementary notice of the time of day that the strike would begin.

Given that the Center might well have figured out that the strike was to begin on the morning of September 29, we might appear unduly parsimonious about compliance with the notice requirement. We are not, however, at liberty to depart from the straightforward unambiguous language of the statute requiring the Union to specify in writing the date and time it would strike. Furthermore, we are convinced that the notice requirement is appropriately read strictly. At a health care institution, disruption in patient care of even a few hours may cost lives. "Strict adherence to notice requirements is essential in the area of health care institutions, in light of Congress' concern 'that sudden, massive strikes could endanger the lives and health of patients....'" *NLRB v. Stationary Eng'rs, Local 39*, 746 F.2d 530, 533 (9th Cir.1984) (citation omitted).

■ We now turn to whether the notice requirement was excused. One of the administrative law judge's grounds for excusing the notice requirement was Pemberton's refusal to engage in mediation efforts with the Federal Mediation and Conciliation Service shortly before the strike. This determination was based on the following statement in the Senate report:

> [I]t is the sense of the Committee that during the ten-day notice period the employer should remain free to take whatever action is necessary to maintain health care, but not to use the ten-day period to undermine the bargaining relationship that would otherwise exist.... While not necessarily a violation of the Act, violation of these principles would serve to release the labor organization from its obligation not to engage in economic action during the course of the ten-day notice period.

**4.** The Senate report states:
> Likewise, the public interest demands that employees of health care institutions be accorded the same type of treatment under the law as other employees in our society, and that the notice not be utilized to deprive employees of their statutory rights. It is clear,

*See* S.Rep. No. 766, *supra,* at 4–5, 1974 U.S.Code Cong. & Admin.News at 3950. We have doubts about the force of this legislative history. This language carves an explicit exception to the notice requirement allowing retaliatory strikes against employers that transgress "principles" of conduct that may not even violate the Act itself. Where the full Congress has not done so, we cannot create an exception to the Act. To borrow the words of Justice Cardozo: "We take the statute as we find it." *Anderson v. Wilson,* 289 U.S. 20, 27, 53 S.Ct. 417, 420, 77 L.Ed. 1004 (1933).

■ Finally, we consider whether the notice requirement was excused under the *Mastro Plastics* exception for unfair-labor-practice strikes. In *Mastro Plastics,* as we have suggested, the Supreme Court found that organized employees were free to strike without losing their protected status under the Act in response to an employer's flagrant unfair labor practice, notwithstanding that the sixty-day notice-of-strike period required under section 8(d) of the Act, for a union desiring to modify or terminate its collective bargaining contract, had not yet elapsed. *See* 350 U.S. at 284–89, 76 S.Ct. at 358–61.

In enacting section 8(g) in 1974, long after *Mastro Plastics* was decided, Congress did not include any exception for unfair-labor-practice strikes. The Senate and House reports, however, indicate that the exception fashioned in *Mastro Plastics* for section 8(d) should also be applied to the section 8(g) ten-day notice requirement. *See* S.Rep. No. 766, *supra,* at 4, 1974 U.S. Code Cong. & Admin.News at 3949; H.R. Rep. 1051, *supra,* at 6.[4] Again, we are somewhat hesitant to give this legislative history effect, because it not so much guides interpretation of ambiguous wording in the statute, but rather creates a significant exception. We do not find it so clear, as the drafters of the Senate report

> therefore, that a labor organization will not be required to serve a ten day notice or to wait until the expiration of the ten day notice when the employer has committed unfair labor practices as in *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

did, that the exception should, or was meant to, apply in the section 8(g) context. Although section 8(d) notice is designed to equalize bargaining power during collective bargaining negotiations by preventing "quickie strikes," *see Mastro Plastics*, 350 U.S. at 288, 76 S.Ct. at 360, section 8(g) notice is not designed to protect the interests of either employers or employees. Section 8(g) notice protects the interests of third parties for whom an unanticipated work stoppage may be a life-or-death matter. We are reluctant to conclude that the full Congress intended to sacrifice the safety of the sick or dying to help labor organizations at health care institutions avoid a ten-day delay in going on strike.

In sum, the two notice requirements serve very different purposes, and we see no reason to assume that an exception to one should automatically transfer to the other. Nevertheless, because the parties did not brief this issue and because its resolution is not necessary to our holding today, we do not base our decision on these grounds.

Even assuming that the *Mastro Plastics* exception applies to section 8(g) and that the unfair practices at issue here were so flagrant as to come within the doctrine's coverage, the exception would not apply given the facts of this case. The purpose of the exception is to excuse employees from a notice requirement, so that they might effectively respond to an employer's unfair labor practices. *See Mastro Plastics*, 350 U.S. at 286–87, 76 S.Ct. at 359–60. The Union's reason for striking may have been to respond to unfair practices, but its reason for not complying with the notice requirement—to collect extra paychecks—was quite different. The delay was not caused by the conduct of the Center, nor was there any reason why the Union did not provide notice of the rescheduled date and time. Delaying the strike date did not further the employees' interest in retaliating for the discharge of the eleven employees. The *Mastro Plastics* exception does not excuse failure to comply with a notice requirement for reasons unrelated to interests protected by the Act.

## CONCLUSION

We find the Center was not denied due process by the handling of this case, and that the Board could properly find that the discharge of the eleven employees was an unfair labor practice. But, because we are unable to find that the notice requirement was either satisfied or excused, we deny the Board's petition for enforcement of its order.

The petition of the Board is denied.