788 F.2d 1412
 122 L.R.R.M. (BNA) 2304, 54 USLW 2627,
104 Lab.Cas. P 11,903
 INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 387,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Arizona Public Service Company, Intervenor-Respondent.
 No. 85-7129.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 2, 1985.
Decided May 6, 1986.
 
 Michael Rubin, A.D. Ward, Ward & Keenan, Marsha S. Berzon, Michael Rubin, Altshuler & Berzon, San Francisco, Cal., for petitioner.
 Patrick Szymanski, John Ferguson, N.L.R.B., Washington, D.C., for respondent.
 Thomas J. Kennedy, Snell & Wilmer, Phoenix, Ariz., for intervenor-respondent Arizona Public Service Co.
 Petition to Review a Decision of the National Labor Relations Board.
 Before BROWNING, Chief Judge, and SNEED and HUG, Circuit Judges.
 PER CURIAM:
 
 
 1
 IBEW Local 387 petitions for review of a decision of the National Labor Relations Board holding that the Arizona Public Service Company did not violate the National Labor Relations Act by disciplining eight employees for participating in a sympathy strike. The Board found the strike prohibited by a broad no-strike provision in the collective bargaining agreement. We reverse and remand for further proceedings.
 
 
 2
 A collective bargaining relationship has existed between the Arizona Public Service Company and the union since 1945. The collective bargaining agreement involved in these proceedings was effective from April 1, 1982 to April 1, 1984.
 
 
 3
 Article I, Section 2 of the agreement contains a broad no-strike pledge relating to work stoppages authorized by the union. It recognizes the right of the company to discipline employees engaging in unauthorized work stoppages, subject to the union's right to invoke the grievance/arbitration procedure contained in Article VII. The no-strike clause does not, on its face, indicate whether it encompasses sympathy strikes, i.e., refusals to cross stranger picket lines.[1]
 
 
 4
 The dispute arose during construction of the Flagstaff City Complex. The Arizona District Council of Carpenters, United Brotherhood of Carpenters and Joiners of America were picketing one of the building contractors at the jobsite. It became necessary to de-energize and remove an overhead power line. A crew of ten company employees, members of the union, was dispatched to do the work. The crew was confronted by a Carpenters picket line. Eight members of the crew refused to cross the line.
 
 
 5
 The company ordered these crew members suspended for five days. The next day, however, the carpenters agreed to remove the pickets temporarily, and the company lifted the suspension so the crew could finish the job. The union later notified the company in writing that the union had not authorized the work stoppage, and posted notices in compliance with Article I, Section 2(b) of the agreement. After the job was completed, the company issued a three day suspension to the employees who had refused to cross the picket line.
 
 
 6
 The union filed unfair labor practice charges, claiming the suspension violated sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. Secs. 158(a)(1) and (3) (1982). The Administrative Law Judge ruled in favor of the union, holding the no-strike clause did not waive the statutory right of employees to engage in sympathy strikes. In so ruling, he applied the then-current Board rule that such a waiver would not be implied solely from a broad no-strike clause, citing Operating Engineers, Local 18 (Davis-McKee, Inc.), 238 N.L.R.B. 652 (1978). Looking to extrinsic evidence of the meaning of the no-strike clause, the Administrative Law Judge found the bargaining history did not reveal a clear understanding that the no-strike clause covered sympathy strikes.
 
 
 7
 The company filed exceptions. The Board reversed, relying upon its intervening decision in Indianapolis Power & Light Co., 273 N.L.R.B. No. 211 (Jan. 31, 1985), which overruled Davis-McKee and established the rule that, absent extrinsic evidence that the parties intended otherwise, a general no-strike clause waives the employee's right to engage in sympathy strikes. The Board held the no-strike clause in the contract in this case waived the right and authorized the company to take disciplinary action. Arizona Public Service Co., 273 N.L.R.B. No. 210 (Feb. 5, 1985).
 
 
 8
 The union challenges the Board's decision on two grounds: (1) the Board's new rule that a general no-strike clause is presumed to waive the employee's right to engage in sympathy strikes is inconsistent with the National Labor Relations Act and Supreme Court authority; and (2) even if valid, the rule was not properly applied in this case. We agree with the second ground; we do not reach the first.
 
 
 9
 The Board and the union agree that the right to engage in a sympathy strike is guaranteed by section 7 of the National Labor Relations Act, 29 U.S.C. Sec. 157 (1982), and that it may be waived by a collective bargaining agreement if the waiver is "clear and unmistakable." NLRB v. Southern California Edison Co., 646 F.2d 1352, 1364 (9th Cir.1981).
 
 
 10
 Whether the contract waives the employees' right to strike "turns upon the proper interpretation of the particular contract before us. Like other contracts, it must be read as a whole and in light of the law relating to it when made." Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 279, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956). Other relevant considerations include the bargaining history, the context in which the contract was negotiated, the interpretation of the contract by the parties, and the conduct of the parties bearing upon its meaning. See Southern California Edison Co., 646 F.2d at 1365-66; United States Steel Corp. v. NLRB, 711 F.2d 772, 778-79 (7th Cir.1983); W-I Canteen Service, Inc. v. NLRB, 606 F.2d 738, 743, 746-47 (7th Cir.1979); News Union v. NLRB, 393 F.2d 673, 677-78 (D.C.Cir.1968).
 
 
 11
 These principles applied before and after the Board changed the presumption arising from a broad no-strike clause. The presumption itself is not a substantive rule. The parties' intent governs; the presumption is only an interpretative aid in seeking out that intent. The Board recognized these principles, but failed to apply them.
 
 
 12
 The Administrative Law Judge examined the existing law, concluding that
 
 
 13
 [i]n the Board's view, broad no-strike clauses, without more, are insufficient to establish waiver of the right to engage in sympathy strikes. Rather, any waiver of the right to engage in a sympathy strike may be found only "in express contractual language or in unequivocal extrinsic evidence bearing upon ambiguous contractual language,"
 
 
 14
 (quoting Davis-McKee, Inc., 238 N.L.R.B. at 652).[2] The Administrative Law Judge noted the contract language did not expressly include sympathy strikes. He therefore examined the language of the bargaining agreement as a whole, the history, and past practices of the union and company to determine whether a waiver of the right should be implied.
 
 
 15
 The Administrative Law Judge concluded that the no-strike provision "clearly [was] posed as the quid pro quo for recourse to a grievance procedure," and that the latter did not apply to the dispute resulting in the employees' sympathy strike.
 
 
 16
 He reviewed the testimony relating to the negotiations for the 1982-84 agreement. The company's negotiators proposed changes in the wording of Article I, Section 2, to make it clear that any work stoppage, including a sympathy strike, was prohibited. The union rejected the proposal and it was withdrawn. The parties disagreed as to the motives of the parties in offering and rejecting the proposal. The Administrative Law Judge expressly credited the testimony of the union witnesses over that of company witnesses and concluded, "[T]here has never been an understanding or agreement between Respondent and the Union that the language of Article I, Section 2 encompassed sympathy strikes."
 
 
 17
 The Administrative Law Judge examined past practices of the company and the union in detail, and stated, "It is clear from the record that, prior to the incident giving rise to this case, no bargaining unit employee was ever disciplined by the Respondent for having engaged in a sympathy strike by refusing to cross another union's picket line to perform work for Respondent." He held,
 
 
 18
 The only positive conclusion that may be drawn from past practice is that the Respondent has maintained a general policy of deferring service in the face of stranger picket lines, and of enlisting the services of the Union in obtaining removal of the pickets so that its employees would perform work at premises where disputes existed between other unions and employers.
 
 The Administrative Law Judge concluded:
 
 19
 In sum, I conclude that Respondent's attempt to broaden the no-strike clause to cover "sympathy strikes" was not successful. The collective-bargaining agreement does not prohibit unit employees from honoring picket lines of other unions, and the evidence fails to establish that the parties had a clear understanding when they executed the last contract that it barred sympathy strikes. The contract is a complex document that obviously was not written by amateurs. If the parties had intended that sympathy strikes should be included within the prohibition of Article I, Section 2, they could have said so in clear unequivocal terms. Instead, the Respondent has sought to include it by amending Article I, Section 2 during the last two negotiation terms.
 
 
 20
 In contrast, in its decision the Board simply quoted the no-strike clause and the union's July 29 letter stating it had not authorized the sympathy strike, and concluded, "Thus, by the terms of the parties' contract, and consistent with the Union's letter, the Respondent 'has the right to take disciplinary action' against the eight employees. Accordingly, we find that the Respondent did not violate the Act by suspending the eight employees for 3 days." Arizona Public Service Co., 273 N.L.R.B. No. 210, slip op. at 3-4 (Feb. 5, 1985) (footnote omitted).
 
 
 21
 The Board did not discuss the actual intent of the parties. The Board noted the overruling of Davis-McKee by Indianapolis Power & Light Co., issued contemporaneously, but did not discuss the impact upon the meaning of the contract of the Davis-McKee rule, which was "the law relating to it when last ratified prior to the incidents at issue," Southern California Edison Co., 646 F.2d at 1365. It was surely relevant to the interpretation of the broad no-strike clause that the law when it was entered into was that such a clause would not create a presumption of waiver of the right to engage in sympathy strikes.
 
 
 22
 The Board also failed to consider the other terms of the contract, the bargaining history, or the past practices of the parties. Instead the court treated Indianapolis Power & Light Co. as establishing an irrebuttable presumption that a broad no-strike clause barred sympathy strikes. It is clear from the face of the Indianapolis opinion itself that the new rule did no more than shift the burden of proving whether a broad no-strike clause was intended to encompass sympathy strikes. See Indianapolis Power & Light Co., 273 N.L.R.B. No. 211, slip op. at 3. Where, as here, substantial evidence was available regarding a relevant change in the law in light of which the clause was negotiated, other provisions of the contract, the negotiations relating to the clause, and the parties' conduct under it, the rule itself requires that the Board consider that evidence.
 
 
 23
 REVERSED AND REMANDED.
 
 
 
 [1]
 Article 1, Section 2 provides in full:
 During the term of this Agreement, and during any period of time while negotiations are in progress between the parties hereto for the extension or renewal of this Agreement, the Union agrees on behalf of itself and each of its members that there will be no authorized concerted failure to report to work, cessation or interruption of work, slowdown, strike, boycott, or any other type of organized interference, coercive or otherwise, with the Company's business.
 The Company agrees, as part of the consideration of this Agreement, that neither the Union, its officers, representatives, or members shall be liable for damages for unauthorized stoppages, strikes, intentional slowdowns, or suspensions of work in the Company's service, if:
 (a) The Union gives written notice to the Company within twenty-four (24) hours of such action that it has not authorized the stoppage, strike, slowdown, or suspension of work;
 (b) Copies of the notice described in (a) above are posted immediately by the Union on the bulletin board;
 (c) The Union further cooperates with the Company in getting the employees to return and remain at work.
 It is recognized that the Company has the right to take disciplinary action, including discharge, against any employees who engage in any unauthorized stoppage, strike, intentional slowdown, or suspension of work, subject to the Union's right to present a grievance on such discipline in accordance with Article VII of this Agreement in cases in which an issue of fact exists as to whether or not any particular employee has engaged in, participated in, or encouraged any such violation.
 
 
 [2]
 The parties disagree as to how long the Davis-McKee rule had been in effect. It is undisputed, however, that the rule was effective when the 1982-84 agreement was entered into and when the events at issue transpired