**CHILDREN'S HOSPITAL MEDICAL CENTER OF NORTHERN CALIFORNIA, d/b/a Children's Hospital of Oakland, Plaintiff–Appellant,**

v.

**CALIFORNIA NURSES ASSOCIATION, Defendant–Appellee.**

No. 00–15636.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 12, 2001.

Filed March 22, 2002.

Bonnie A. Glatzer, Thelen Reid & Priest
LLP, San Francisco, CA, for the appellant.

M. Jane Lawhon, Law Offices of James Eggleston, Oakland, CA, for the appellee.

Before: REINHARDT, HAWKINS, and RAWLINSON, Circuit Judges.

REINHARDT, Circuit Judge.

The California Nurses Association gave notice to the Children's Hospital of Oakland in August, 1998, that it intended to conduct a 24–hour sympathy strike at the hospital to show support for other workers who were planning to engage in a primary strike. The hospital then filed this action, seeking a declaration that sympathy strikes are barred by the no-strike provision in the collective bargaining agreement, and seeking damages for the expenses incurred in strike preparation. The district court granted summary judgment in favor of the union, and the hospital appeals. The appeal raises the question whether a general no-strike clause in a collective bargaining agreement bars sympathy strikes.

## I. Background

The California Nurses Association (CNA) represents all of the approximately 650 nurses who work at Children's Hospital of Oakland (CHO). In the summer of 1998, Local 6 of the International Longshore and Warehouse Union (ILWU), which represents the CHO's x-ray technologists, was engaged in contract negotiations with the hospital. Local 6 established a strike deadline of August 31, and soon thereafter, pursuant to section 8(g) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(g), CNA gave written notice of its intent to conduct a sympathy strike, should ILWU Local 6 in fact call a primary strike.[1] In response to the sympathy strike notice, the hospital took a number of precautions, including canceling some types of surgeries, transferring patients with certain needs, and declining to accept new patients. Shortly before the deadline, the threatened x-ray technologists' strike was averted. Consequently, the CNA sympathy strike did not occur.

Contending that the no-strike clause of its collective bargaining agreement with the nurses' union prohibited sympathy strikes,[2] CHO filed this action pursuant to the NLRA, 29 U.S.C. § 185,[3] seeking a declaration that the no-strike clause bars sympathy strikes. CHO also sought monetary damages for the economic losses resulting from the precautionary measures taken after CNA gave its sympathy strike notice.[4] After discovery, the parties filed

1. NLRA § 8(g) requires that a labor organization give ten days notice prior to any strike, picketing, or concerted refusal to work at a health care institution. Labor organizations that contemplate calling a strike upon the expiration of a current collective bargaining agreement must give any employer covered by the NLRA sixty days notice. 29 U.S.C. § 158(d)(4).

2. The no-strike provision of the collective bargaining agreement states: "There shall be no strikes, lockouts ... or interruptions of work during the life of this agreement." This clause was first agreed to by the parties during their 1971 labor negotiations, and has remained unchanged during at least ten subsequent renegotiations of the bargaining agreement.

3. The National Labor Relations Act was enacted in 1935, and significantly amended in 1947 by the Labor Management Relations Act (LMRA). 29 U.S.C. § 185 was enacted as § 301 of the LMRA. In this opinion, for convenience, we will refer to the National Labor Relations Act, as amended, as the "NLRA" or the "Act".

4. Because damages could be awarded only if CHO received a declaration that the no-strike

cross-motions for summary judgment, and the district court granted the defendant's motion. We review the district court's grant of summary judgment *de novo*. *Playboy Enter. v. Welles*, 279 F.3d 796, 800(9th Cir.2002).

## II. Discussion

This case presents the question of whether and under what circumstances a general no-strike clause in a collective bargaining agreement waives the employees' rights to engage in sympathy strikes. Specifically, we determine whether in this case the CNA waived the right to call a strike in sympathy with the members of another union.

### A. Waiver of Sympathy Strike Rights

■ The term "sympathy strike" ordinarily refers to a strike conducted by workers belonging to one bargaining unit in support of a primary strike that is conducted by workers belonging to another bargaining unit at the same plant or shop.[5]

The two groups of workers are usually represented by different unions. The primary strikers are seeking improved wages, benefits, and working conditions or are protesting unfair labor practices or other grievances. The sympathy strikers do not have a primary objective of their own, but seek to assist the primary strikers to achieve *their* goals.

■ The right to honor another labor organization's picket lines is established by § 7 of the NLRA, which provides that:

Employees shall have the right to self-organization, to form, to join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activity for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from ... such activities....

29 U.S.C. § 157. Sympathy strikes have long been held to fall within the protections of § 7, and to constitute lawful acts of concerted activity.[6] In discussing the importance of the role of sympathy strikes to the efforts of workers to organize collectively, we have previously observed that "[a]n integral part of any strike is persuading other employees to withhold their services and join in making the strike more effective." *NLRB v. Southern Cal. Edison*, 646 F.2d 1352, 1363 (9th Cir.1981). Sympathy strikes are a means by which workers can demonstrate their solidarity

clause prohibited sympathy strikes, in the interests of efficiency the district court bifurcated discovery so that the contract interpretation issue would be resolved prior to any damages discovery.

5. Under the NLRA, union representation is conducted on a "bargaining unit" basis. *See* 29 U.S.C. § 159(a). Upon a showing of sufficient interest in union representation by workers, the NLRB will determine the boundaries of an appropriate bargaining unit, based on a variety of factors related to whether the workers share a "community of interests." 1 Patrick Hardin, *The Developing Labor Law* (1992) 448. There are often multiple bargaining units at a single employer's facility, although a bargaining unit may also exist across multiple employers. *Id.* at 451.

6. As Judge Learned Hand stated in one of the first cases to recognize that § 7 encompasses the right to engage in sympathy strikes:

When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a 'concerted activity' for 'mutual aid or protection,' although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each one of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established is 'mutual aid' in the most literal sense....

*NLRB v. Peter Cailler Kohler Swiss Chocolates Co.*, 130 F.2d 503, 505–06 (2d Cir.1942).

with their "brothers and sisters" who are engaged in a primary strike. "[R]espect for another union's picket line leads to a stronger labor movement." *Id.* at 1364.

The right to strike, including the right to strike for the purpose of supporting the cause of workers represented by a different union, may be waived in a collective bargaining agreement. *See Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 280, 76 S.Ct. 349, 100 L.Ed. 309 (1956) (strike waiver generally); *NLRB v. Rockaway News Supply Co.,* 345 U.S. 71, 80, 73 S.Ct. 519, 97 L.Ed. 832 (1953) (sympathy strike waiver). Any waiver by a union of the right to strike must, however, be "clear and unmistakable." *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 708, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983). We have applied that rule specifically to waivers of the right to engage in sympathy strikes. *Oil, Chem. and Atomic Workers Int'l. Union, Local 1–547 v. NLRB,* 842 F.2d 1141, 1143 (9th Cir.1988) (hereinafter *"Chevron"*) (quoting *Metropolitan Edison Co.,* 460 U.S. at 708, 103 S.Ct. 1467); *International Bhd. of Elec. Workers v. NLRB,* 788 F.2d 1412, 1414 (9th Cir.1986) (hereinafter *"Arizona Public Serv."*). A general no-strike clause that does not specify whether sympathy strikes are included or excluded does not, simply by virtue of its incorporation in a collective bargaining agreement, constitute such a clear and unmistakable waiver. *Indianapolis Power & Light Co. v. NLRB,* 898 F.2d 524, 528 (7th Cir.1990).[7] The rationale for applying the "clear and unmistakable" standard to waivers of strike rights is this: if a union is negotiating away employees' rights that are fundamental to the collective bargaining process, any proposed contract must unambiguously put those employees on notice of the waiver. *See Interstate Brands Corp. v. Bakery Drivers & Bakery Goods Vending Machines, Local 550,* 167 F.3d 764, 767 (2d Cir.1999) (discussing the rationale for the "clear and unmistakable" standard).

Despite our well-established rule, the hospital argues that in this case the "clear and unmistakable" standard does not apply. CHO first contends that when CNA threatened a sympathy strike, it exercised its own rights, and not those of the membership. The hospital maintains that, following the Supreme Court's holding in *Wright v. Universal Mar. Serv. Corp.,* 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998), the clear and unmistakable standard is not applicable to a union's waiver of its own rights. In *Wright,* the Supreme Court stated that the clear and unmistakable standard does not apply to an "an individual's waiver of his own rights." *Id.* at 80–81, 119 S.Ct. 391. The hospital apparently constructs the unusual argument that in this case the union was acting on its own behalf, and not on behalf of the workers it represents, in order to escape *Wright* 's unequivocal affirmation that the clear and unmistakable standard applies to "a union's waiver of the rights of represented employees." *Id.* at 80, 119 S.Ct. 391.

CHO relies on the fact that the August, 1998 sympathy strike notice was issued by CNA without a prior poll of its members

---

7. Other limits have been read into general no-strike clauses as well. For example, the doctrine of "coterminous interpretation" requires that a general no-strike clause should be read only as broadly as the arbitration clause of the collective bargaining agreement, because "a contractual commitment to submit disagreements to final and binding arbitration gives rise to an implied obligation not to strike over such disputes." *Gateway Coal Co. v. United Mine Workers of Am.,* 414 U.S. 368, 381–82, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *see also Chevron,* 842 F.2d at 1144. Also, in *Mastro Plastics Corp.,* 350 U.S. at 281–84, 76 S.Ct. 349, the Supreme Court held that a general no-strike clause does not serve to prohibit concerted activity protesting unfair labor practices.

(although under the NLRA, a membership vote is not required). CHO contends that because the individual employees were never specifically asked whether they wished to assert their rights, and were free to refrain from participating in the threatened action, the strike threat was an act by the union on its own behalf only. Relying on *Wright*, CHO then argues that if the union is considered to have exercised its own sympathy strike rights, rather than its members', then the "clear and unmistakable" standard does not apply, and the general language of the no-strike clause must be read to bar the union's action.[8]

■ There are two fundamental errors in the hospital's argument. First, neither the language of the NLRA, precedent nor logic supports the distinction the hospital seeks to draw between the union's rights and those of its members. A member's right to strike is derived from § 7 of the NLRA, that by its very terms, protects *employees'* rights to engage in concerted activities. It is a right, like the other rights protected by § 7 of the NLRA, that may be implemented collectively through concerted action, principally in the form of union-inspired or authorized collective economic action. Section 7 does not, however, bestow on a union a right to strike that is separate and distinct from the rights of the workers it represents. Rather, when a union calls or conducts a strike, it does so in its capacity as the representative or agent of its members, and acts for and on their behalf. Such is the function of labor unions: to act as the collective bargaining representative of their members (as well as of other employees in the bargaining unit). *See Wright*, 525 U.S. at 80, 119

S.Ct. 391. There is no precedent for the hospital's suggestion that the right to strike involves two separate bundles of rights, one belonging to the union and the other to the workers. Indeed, in *Southern California Edison* we dismissed a similar argument, only in that case it was the NLRB General Counsel who asserted that a waiver in the collective bargaining agreement applied only to the union and not to its members. We summarily "reject[ed] the ... suggestion that the no-strike language addressed only union-sponsored activity and left individual employees free to engage in strike activity." 646 F.2d at 1367 n. 7.

■ The second flaw in the hospital's argument is that *Wright* does not alter our analysis of waivers of strike rights. To the contrary, it supports CNA's argument. In *Wright*, the Supreme Court reasoned that because a union acts as an agent or representative, it remains a third party for waiver purposes. 525 U.S. at 80, 119 S.Ct. 391. The Court examined the applicability of the "clear and unmistakable" standard in the context of a claim that a collective bargaining agreement included a waiver of rights, and concluded that the standard applies to "a union's waiver of the rights of represented employees." *Id.* at 80, 119 S.Ct. 391. Thus, nothing in *Wright* requires us to depart from our precedent that a union's waiver of the right to engage in a sympathy strike must be clear and unmistakable.

All three of our prior sympathy strike cases have applied the clear and unmistakable rule. *See Chevron*, 842 F.2d at 1144; *Arizona Public Serv.*, 788 F.2d at 1413–14; *Southern Cal. Edison*, 646 F.2d at 1365.

---

8. CHO also points to the Second Circuit's decision in *Interstate Brands Corp. v. Bakery Drivers and Bakery Goods Vending Machines, Local Union 550*, 167 F.3d 764 (2d Cir.1999). There, the court, applying *Wright*, held that an employer's waiver of its own statutory rights in a collective bargaining agreement did not need to be clear and unmistakable, because the employer was acting on its own behalf. *Id.* at 767–69.

CHO contends that the three cases are inapplicable here because they all involved union members who refused to cross another union's picket lines even though their own union failed to call a sympathy strike. It is true that in none of the three cases did we address the effect of a general no-strike clause on a *union-called* sympathy strike. However, we see no reason why a general no-strike clause should apply differently when the individual workers choose to honor another union's picket lines on their own, than when those workers act in response to a union's call for collective action. Nor, if the applicable collective bargaining agreement does not prohibit the workers from exercising collectively the right to engage in a sympathy strike, do we see any basis for concluding that it forbids the union to act in its statutorily-mandated role as their collective bargaining representative and call a sympathy strike.

■ We therefore reaffirm our earlier holdings that the waiver of the right to engage in sympathy strikes must be clear and unmistakable. This holds true regardless of whether workers seek to exercise that right in the absence of any union action, or whether the union asserts the right to call a sympathy strike on behalf of those it represents. In both instances, if the union and the employer have negotiated a waiver of the members' statutory right to strike, we must carefully examine the scope and circumstances of the particular waiver provision to determine whether the right to engage in sympathy strikes has been clearly and unmistakably waived.

## B. The Scope of the No–Strike Provision

■ We turn now to an analysis of the no-strike clause in the collective bargaining agreement between the hospital and CNA to determine if it contains a clear and unmistakable waiver of the nurs-

es' rights to engage in sympathy strikes. Whether a union has clearly and unmistakably waived sympathy strike rights of those it represents is determined by the provisions of the particular collective bargaining agreement at issue and the intent of the parties. *Arizona Public Serv.*, 788 F.2d at 1414 (quoting *Mastro Plastics Corp.*, 350 U.S. at 279, 76 S.Ct. 349). We have held that when, as here, the language of a no-strike clause is general in scope, we must examine the relevant extrinsic evidence to determine if the parties intended that general language to include sympathy strikes. *Id.*

Although the NLRB has held that a general no-strike clause gives rise to the presumption that sympathy strikes are included, *Indianapolis Power & Light Co. v. Local 1395, IBEW*, 273 N.L.R.B. 1715, 1715, 1985 WL 45990 (1985), *rev'd. on other grounds*, 797 F.2d 1027 (D.C.Cir.1986), it also held on remand that the presumption may be overcome by extrinsic evidence showing that there was no *mutual* intent to include sympathy strikes within the scope of the clause. *Indianapolis Power & Light Co. v. Local 1395, IBEW*, 291 N.L.R.B. 1039, 1041, 1988 WL 214249 (1988). On remand, the Board ruled that "an agreement to disagree over the scope of [a] no-strike clause" does not waive the right to honor other unions' picket lines. *Id.* On that basis, it found that there was no clear and unmistakable waiver in the case before it.

■ In reviewing the Board's second *Indianapolis Power* decision, the Seventh Circuit commented on the incoherence of the Board's use of the presumption that a broad no-strike clause encompasses sympathy strikes, pointing out that the presumption is of little significance in light of the fact that "the Union's waiver of the employees' statutory rights must be clear and unmistakable." *Indianapolis Power*

*& Light Co. v. NLRB*, 898 F.2d 524, 528 (7th Cir.1990). Although the court did not formally proscribe the Board's use of the presumption, it concluded that as a practical matter when extrinsic evidence of the parties' intent exists, "the burden is on the employer to show that the parties intended to include sympathy strikes within the purview of the no-strike clause." *Id.*

■ Although after the *Indianapolis Power* cases were decided by the NLRB, we explicitly declined to decide whether the presumption is proper under the NLRA, *see Chevron*, 842 F.2d at 1146–47, we agree with the observations of the Seventh Circuit. There is obviously a substantial tension between applying a presumption of waiver and requiring that a waiver be clear and unmistakable. As a practical matter, there is always extrinsic evidence of some sort, if only the contract history. Thus, regardless of any presumption, the burden inevitably shifts to the employer to show by clear and unmistakable evidence that a general waiver of the right to strike includes sympathy strikes. Accordingly, we adopt the Seventh Circuit's reasoning:

> Since the Union's waiver of the employees' statutory rights must be clear and unmistakable, the extrinsic evidence must manifest a clear *mutual* intent to include sympathy strikes within the scope of the no-strike clause or else the clause will not be read to waive sympathy strike rights.... A broad no-strike provision by itself is not sufficient to waive the right to engage in sympathy strikes if extrinsic evidence of the par-

ties' intent does not demonstrate that the parties' [sic] *mutually* agreed to include such rights within the breadth of the no-strike clause.

*Indianapolis Power*, 898 F.2d at 528 (emphasis added). Because the NLRB presumption is of so little practical consequence, we see no greater reason here than we did in *Chevron* to determine its validity.

■ Generally, in reviewing extrinsic evidence as part of our effort to construe a collective bargaining agreement, we look to "the bargaining history, the context in which the contract was negotiated, the interpretation of the contract by the parties, and the conduct of the parties bearing upon its meaning." *Arizona Public Serv.*, 788 F.2d at 1414; *see also John Morrell & Co. v. United Food Workers*, 913 F.2d 544, 551 (8th Cir.1990); *United States Steel Corp. v. NLRB*, 711 F.2d 772, 778–79 (7th Cir.1983). After examining the extrinsic evidence in this case, the district court granted CNA's motion for summary judgment, concluding that no question of material fact existed as to whether CNA clearly and unmistakably waived its sympathy strike rights. We agree, and address the relevant *Arizona Public Service* factors.[9]

*Bargaining History.* The history of bargaining between CNA and the hospital strongly militates against a conclusion that the union clearly and unmistakably negotiated a waiver of the employees' right to engage in a sympathy strike. Although CNA has represented the nurses employed

---

**9.** We do not address, except in this note, the legal context in which the contract was negotiated, because it is inconclusive. When the no-strike language was first adopted by the parties, nonprofit hospitals like CHO were not even covered under the NLRA; the act was not amended to govern nonprofit hospitals until 1974, 3 years after the adoption of the no-strike clause. Act to Amend the NLRA,

Pub.L. 93–360, § 1, 88 Stat. 395 (1974). Moreover, the NLRB's rulings governing the construction of no-strike clauses changed twice during the time that the instant no-strike clause has been in effect. Thus, it would be difficult to identify the pertinent "legal context" that informed the parties' understanding of the clause.

at Children's Hospital since the early 1950's, the collective bargaining agreement did not include a no-strike provision at all until 1971. In that year, a no-strike clause identical to the current one was added to the collective bargaining agreement between CNA and the Associated Hospitals of San Francisco and the East Bay, a multi-employer bargaining association that included CHO. The Associated Hospitals' chief negotiator testified that there was no discussion across the table as to whether or not the no-strike clause included sympathy strikes. From 1971 through 1985, CNA and Associated Hospitals agreed to a series of six collective bargaining agreements, all of which included the same no-strike clause. Neither party recalls any discussion of the no-strike clause whatsoever during the bargaining sessions that yielded those agreements.

Beginning in 1985, CNA negotiated its contract directly with CHO rather than with the Associated Hospitals; the no-strike provision has never been changed. CHO did, however, attempt to modify the provision. It proposed to alter the no-strike clause in 1987. During the negotiations over the 1987–89 collective bargaining agreement, the hospital proposed the following language:

> There shall be no strike, work stoppages, or other interruption of work during the life of this Agreement by the CNA or employees: however, it is expressly understood that this sentence does not apply to sympathy strikes. During the life of this Agreement, there shall be no sympathy strikes by the CNA. Furthermore, the CNA will not threaten to engage in any activity prohibited by this Article.

The union consistently rejected this proposal, and it was not adopted.

CHO now contends that its 1987 proposal was merely a "clarification" of the existing language, and that it supports the inference that sympathy strikes were always included in the scope of the general no-strike provision. The history of the 1987 negotiations, however, supports the opposite conclusion: that *neither* side understood the general no-strike clause to include sympathy strikes. A document prepared by the hospital for a mediation session included a list of eleven numbered "language clarifications." The proposed sympathy strike language was not among them; instead, it was listed separately on the same document as a distinct "proposal." The hospital now contends the placement of the sympathy strike proposal on the document apart from the proposed "clarifications" was a typographical error.

Equally persuasive, toward the end of the contract negotiations, CHO offered to accept a CNA proposal for a tenure step change in exchange for CNA's accepting the new "no sympathy strike" clause. This bargaining posture indicates CHO's belief that to include sympathy strikes within the no-strike clause's reach would be an important change in the contract's terms, and not a mere "clarification" of the status quo. Otherwise, it would have been unlikely to offer such a concession in return for the new no-strike clause provision. *See Indianapolis Power,* 797 F.2d at 1036, n. 10(noting that a union's proposal to exclude sympathy strikes specifically from a general no-strike clause in two consecutive rounds of contract negotiations supported the inference that the union did not consider sympathy strikes to be permitted by the collective bargaining agreement in the first instance).

*Past Practice.* In determining whether a waiver occurred, we look as well to "the interpretation of the contract by the parties, and the conduct of the parties bearing upon its meaning." *Arizona Public Serv.,* 788 F.2d at 1414. Because these two fac-

tors are so closely related, we consider them together.

The parties' past practice, like the bargaining history, militates strongly in favor of the conclusion that CNA did not clearly and unmistakably waive its sympathy strike rights. To the contrary, the evidence regarding the steps that CNA took on several occasions to initiate sympathy strikes while the current no-strike clause was in effect, and CHO's consistent lack of response is wholly inconsistent with any determination that the parties mutually intended to waive the workers' right to engage in sympathy strikes.

For example, in 1979, SEIU Local 250, which represents many CHO employees, struck the Associated Hospitals. CNA leadership testified that because many of its own members failed "to perceive themselves as having a common cause with [the striking] workers," the union, after debating whether to call an official sympathy strike, decided against doing so. Nonetheless, some CNA-represented nurses refused to cross the Local 250 picket line, thereby forcing CHO to close at least one unit of the hospital. Those sympathy strikers were not disciplined by CHO. Moreover, in 1983, Local 250 again engaged in a primary strike, and this time CNA issued a 10–day sympathy strike notice. Although the hospital now maintains that its understanding of the no-strike clause has always been that sympathy strikes by the employees acting on their own were permitted, but that the union was prohibited from calling such strikes, the record contains no communication to CNA that its proposed union-called sympathy strike would be illegal. In that case, as in this one, the primary strike was averted and the sympathy strike never occurred. Nonetheless, in 1983, CHO raised no legal objection to the proposed sympathy strike, nor did it seek clarification from the courts as to the scope of the no-strike clause. In 1996, SEIU Local 250 once again issued a ten-day strike notice, and CNA once again considered striking in sympathy. Although CNA posted a notice throughout the hospital that the nurses union would soon issue a ten-day strike notice in support of Local 250, no management official contacted CNA to assert that this was prohibited by the collective bargaining agreement.

The only reasonable inference from the bargaining history and past practice of the parties is that, at the very minimum, CNA did not clearly and unmistakably waive any sympathy strike rights. Drawing every possible inference in favor of the hospital, as we must, the most we could conclude would be that the parties agreed to disagree about the meaning of the clause. That, however, is insufficient to support a clear and unmistakable waiver. There was indisputably no "mutual intent" to include sympathy strikes within the scope of the general no-strike clause. *Indianapolis Power*, 797 F.2d at 1036 (noting that if "the parties had agreed to disagree over whether sympathy strikes were covered by the [no-strike] clause," then "*a fortiori*, no clear and unmistakable waiver of the right to honor picket lines" could be found.). Thus, the general waiver of the right to strike in the collective bargaining agreement does not include sympathy strikes.

## CONCLUSION

We reaffirm that for a union to waive the Section 7 right to engage in a sympathy strike, the waiver must be clear and unmistakable, so that the membership will be on notice that this important collective bargaining right is being bargained away. Because the facts in this record, viewed in the light most favorable to CHO, demonstrate that there was no clear and unmistakable waiver by CNA in this case, the

district court was correct to grant summary judgment in favor of the union.

**AFFIRMED.**